# STATE OF WYOMING,

*Plaintiff and Respondent,*

vs.

# T. KYLE WOODWARD,

*Defendant and Appellant.*

No. 2508; 240 Pac. (2d) 1157; February 19, 1952)

264

For the defendant and appellant the cause was submitted upon the brief of Clarence G. Cypreansen,

Thomas A. Nicholas and Alex B. King, all of Casper, Wyoming.

For the plaintiff and respondent the cause was submitted upon the brief of Harry S. Harnsberger, Attorney General, Howard B. Black, Deputy Attorney General, and Jack D. Fraggatt, Assistant Attorney General, all of Cheyenne, Wyoming.

## OPINION

BLUME, Chief Justice.

The defendant T. Kyle Woodward, commonly known as Kelly Woodward was convicted in the district court of Natrona County of the crime of aggravated assault and was sentenced to be confined in the jail of Natrona County for the term of five months and to pay a fine of $500. From that conviction and judgment the defendant has appealed to this court. He will hereafter be referred to as the defendant or appellant or both.

The original information filed on April 27, 1950, charged that the defendant on April 22, 1950, "did then and there wilfully and unlawfully and feloniously commit a violent injury upon the person of one John F. Cullen, by then and there unlawfully, feloniously striking and beating the said John F. Cullen with his hands and fists and feet, with intent then and there and thereby, him, the said T. Kyle Woodward unlawfully, feloniously, purposely and with premeditated malice to kill and murder, and to do grievous bodily harm to the said John F. Cullen being then and there a human being." On July 25, 1950, the defendant by his attorney made a motion to quash the information on the ground that it charged two separate offenses in the same count. On the same day the prosecuting attorney filed an amended information charging that the defendant "did then and there wilfully and unlawfully and feloniously commit a violent injury upon the person of one John F. Cullen, by then and there unlawfully, feloniously striking and beating the said John F. Cullen with his hands and fists and feet with the intent then and thereby unlawfully, feloniously, purposely and with premeditated malice to kill and murder the said John F. Cullen." It may be noted that the only substantial difference between the original information and the amended information is that the latter left out the matter of grievous

bodily harm. The defendant pleaded not guilty to the amended information, but made no objection thereto by motion or otherwise.

## 1. QUESTIONS AS TO INFORMATION.

It is contended that the information is insufficient for any purpose because it fails to state that the defendant had the present ability to commit the crime, such allegation being necessary in a charge of assault under our statute. But the information charges assault and battery. When an injury has actually been inflicted, it is quite apparent that the ability to do so existed, and it would be quite superfluous to allege it. Chandler v. State, 141 Ind. 106, 39 N.E. 444. The further objection is made that the information, to be sufficient should have contained the elements necessary in a charge of assault and battery which is defined under our statute as follows: "Whoever, in a rude, insolent or angry manner, unlawfully touches another, is guilty of assault and battery." § 9-209 Wyo. Comp. Stat. 1945. We think that each and every element here mentioned—and of course much more—is included in the charge made in the amended information filed in this case. Chandler v. State, supra, Dotson v. State, 14 Okla. Crim. 50, 166 Pac. 902. It is further contended that the information does not properly contain and should not be considered as containing the charge of aggravated assault mentioned in § 9-210 Wyo. Comp. Stat. 1945, which defines aggravated assault and battery as follows: "If any person shall unlawfully and maliciously inflict upon another person, either with or without any weapon or instrument, any grievous bodily harm, or shall unlawfully and maliciously cut, stab or wound any other person, the person so offending shall be fined" etc. While no specific mention of serious bodily injury is made in the amended information, the charge of aggravated assault and battery is included as a lesser offense in the charge

contained therein. Elliott v. State, 47 Wyo. 36, 30 Pac. (2d) 791, State v. Parmely, 65 Wyo. 215, 199 Pac. (2d) 112.

Counsel for appellant think, however, that the case at bar is different from Elliott v. State, supra, by reason of the fact that in this case the original information contained an allegation as to serious bodily harm; that after the motion to quash was filed, that allegation was eliminated; that, accordingly, there was an election on the part of the state to try defendant only on the more serious charge and to eliminate the lesser. Counsel would have us draw the conclusion that the conviction of aggravated assault and battery herein is invalid. We think counsel are in error. The original information charged a felony as well as a misdemeanor. The inclusion of the misdemeanor—that relating to the infliction of grievous bodily harm—was wholly superfluous, since that, as above noted was as a matter of law included in the charge of felony. Still, it may be that as a matter of orderly procedure, the motion to quash was well taken. See Perue v. State, 43 Wyo. 322, 2 Pac. (2d) 1072. But the prosecuting attorney had a right to amend the information. § 10-611, Wyo. Comp. Stat. 1945, State v. Kusel, 29 Wyo. 287, 213 Pac. 367. No objection was raised to that procedure. We can find no sound reason for holding that the filing of the amended information which omitted the charge as to grievous bodily harm constituted an election to eliminate the lesser charge.

We are referred to the case of Commonwealth v. Bass, 4 Kulp 77, (4 Luzerne Legal Register Reports 77). In that case, the defendant was charged with rape in the first count, and with assault with intent to ravish in the third count. The court recognized the rule that an acquittal or conviction for a greater offense is a bar to a subsequent indictment for a minor offense included in the former, and that, if the defendant had been merely

charged with rape, he might have been convicted of a simple assault or of an attempt to commit the felony. But the state had definitely elected to try the defendant only on the first charge, that is to say for rape, and the court held that, in view of that fact, the defendant could not have been convicted of an assault with intent to ravish, and hence the acquittal of the charge of rape was not an adjudication of the charge in the third count. We have some doubt as to the correctness of the decision. It is doubtful that when the prosecuting attorney amended the information, he had the right to thereby eliminate any included and lesser offense, thereby depriving the defendant of the benefit of being convicted by the jury of a lesser offense included in the greater. It would seem that the law, and not the prosecuting attorney determines as to whether or not a lesser offense is and remains included in the greater. In any event, no election as claimed was made in the case at bar and the holding in the foregoing case is no authority herein. For aught the record shows, the prosecuting attorney eliminated the charge as a grievous bodily harm from the amended information merely because he discovered that this charge was already included in the remaining charge under our holding in Elliott v. State, supra.

## 2. SUFFICIENCY OF EVIDENCE TO CONVICT.

Appellant contends that the evidence is insufficient to show an aggravated assault and battery, seemingly thinking that he is guilty of no more than a simple assault and battery. To determine that question, the evidence must be examined. While, in view of the fact that cases generally differ, it may be of little use, in order to serve as a precedent, to set out the facts in detail, we shall, in deference to counsel for the appellant do so. The salient facts, as shown by the evidence adduced by the State are as follows: One Lessie Sims, who

apparently worked in the same place as the defendant, lived in a small house on the rear of the same lot on which the house and residence of the prosecuting witness, John F. Cullen, was located. The latter lived in his residence together with his wife and a daughter. According to the testimony of both Cullen and Mrs. Sims, they did not know each other, but defendant apparently thought otherwise. Cullen returned home sometime after midnight of April 21, 1950, and while he was putting his automobile in his garage, appellant, who apparently was looking for Lessie Sims, turned a flashlight on him and asked Cullen what he was doing. It would seem that the defendant was up practically all the night drinking intoxicating liquor and he was intoxicated, at least to some extent, the next morning. On the morning of April 22, 1950, about 8:30 a.m., he invaded the home of Cullen without knocking and without any invitation and, according to his own admission, he was an intruder in the house. He was at that time apparently looking for Mrs. Sims. Cullen testified as follows as to what then took place:

I was awakened about 8:30 in the morning when the defendant entered my bedroom which was upstairs in my residence. He said, "Hello." I said, "What are you doing in this house?" Defendant stated he came to say hello. "Is that all right?" I said, "That's all right if you have any business in the house. I wish you would leave. I don't appreciate your breaking in my house." Defendant left, went to Mrs. Sims' house, evidently did not find her in and came back to my house about 15 minutes later. I got up and went out in the hall. I said, "What are you doing here? I asked you to get out. I wish you would get out and stay out." Defendant said, "I want to talk to you." I was in my pajamas and my bare feet. Defendant asked, "Where is Lessie?" I said, "I don't know anything about Lessie, haven't seen her, know nothing about her." Defendant said, "You're a

G. D. liar," and with that he hauled off and hit me. I think the first blow he struck me was above the eye, and it knocked me down. I fell into the doorway of the bathroom. Then he ran up and started kicking me, and said, "If you don't tell me where Lessie is, I will kill you, you S. of a B." He jumped on top of me then, held me down, started mauling and pummeling me with his fists and said, "If you don't tell me where she is, I will kill you, you S. of a B." I had a cut on my forehead and was bleeding profusely from it. I tried to hold him off of me when I was lying on the floor and he was pummeling me. When I first fell down, he ran up and started kicking me demanding "Where is Lessie, you tell me." He stomped on me and kicked me. I was beginning to get very weak and was feeling faint. The struggle continued for about 10 minutes. Defendant had had some drinks. I said, "Let's go downstairs and talk this over." I told him it would do no good to kill me, he would simply hang for it. Finally we went downstairs into the kitchen. I got two glasses and poured a little whiskey in each, intending to put some water in. The defendant turned his head and I picked up the bottle, the cork out of it, and hit him over the side of the head with the bottle, hoping I could knock him out enough so I could call the police. The blow staggered the defendant, but he came after me. He said, "Now you asked for it, you're going to get it." He started to grab me. We fought with the bottle for three or four minutes. Defendant stated, "I am going to kill you, you S. of a B." I could not get enough force to knock him out with the bottle. When he grabbed me, we fell over a table in the rear of the room, and we were both on the floor wrestling. I was bleeding. The uppers of my pajamas were soaked with blood. There was blood where I fell against the window curtain, on the table, and on the wall. I had fallen against the wall. When we went down into the kitchen, I asked the defendant to call a doctor. I was

bleeding badly and was getting weak from the loss of blood. Defendant stated, "You're not calling anyone if you don't tell me where Lessie is." The doors were closed when the police came and I told them to break open the doors. Dr. Riach treated me that morning and the next day. At the time of the affray, Woodward kicked me and was stepping on me, kicking me as I lay on my back. He was stomping me on the chest. He had an instrument of some kind, it cut my forehead. It was probably some kind of a ring. (This was confirmed by the defendant's testimony.) My wounds healed and the blackness disappeared in a day or two and my black eyes disappeared during that time to some extent. I went to the dentist a week or so later and had him check my teeth. He found a couple of loose teeth.

Mrs. Bordeaux, a neighbor, testified that she heard terrific noise coming from Cullen's property, that she heard a terrific crash next door; that she heard thuds and thumps and heard someone say, "Don't hurt me, don't hit me any more."; that this person kept pleading; that she heard another voice say to keep still and "Tell me where she is."; and heard the threat, "I'll kill you, you son of a bitch."; that she heard something about calling the police and something about "Don't touch that phone or I'll kill you."; that she subsequently called the police; that she did not recognize the voices; that she did not call the police until the matter had been going on for some 20 minutes.

The witness Charles Bordeaux, a neighbor, testified that he heard a voice say, "No, you can't call. I'm going to kill you, you son of a bitch."; that he then started out but about that time the officers came. The door was locked and he heard Cullen say, "Break it in," and that the door was accordingly broken open. Cullen was dressed in pajamas and barefoot. He was very bloody. His pajamas were bloody. There was blood on the

kitchen table and some on the wall. Cullen was bleeding on the forepart of his head. I helped Cullen upstairs. He was very weak. I took off the upper part of his pajamas and had him sit in a chair. When I saw the gash on his forehead and the bruises, I then called the doctor. The bruises were bluish and discolored. The discolorations on the chest were large, about 2½ inches in diameter. About two feet inside the bathroom door on the floor was a small puddle of blood, about six inches wide, ten inches long, of clotted blood standing in a puddle on the bathroom floor and there were blood splotches in the hall outside. The defendant had some blood on him, but the witness could see no open wounds on him.

Dr. T. J. Riach, a physician, who was called in to examine and treat Cullen testified as follows: "When I went in, he was standing in the bathroom, head, face and shoulders and rest of body as far as his waist all covered with blood. Had laceration on left forehead that was deep and little over half inch long, Y-shaped, and was bleeding quite freely. Bruises beneath both eyes, commencing to become discolored and by next day they were definitely black. Several marks, apparently bruises on chest in front. He was weak and chilling somewhat, apparently in shock from loss of blood. One of his feet, left foot I believe, was bruised over lower part of foot and on the toes, becoming discolored. Put him in bathtub and got him cleaned up. Got rid of the blood and cauterized wound on head, put sterile dressing on it. Saw him that evening and again next day. On following day, both eyes were black, chest bruised, foot discolored from bruise of toes. Bruise on chest was maybe an inch, or at the most, two inches in diameter. Four or five bruises right over front of chest. On the first morning he was in some shock, weak from loss of blood, pump was slower and he was rather pale and was shaking like in a chill. No danger of his dying at that

time. Didn't find any bones broken at that time. Several days later he complained of pain in tip of left elbow, and he had gone to Dr. McLellan and Dr. McLellan had it X-rayed and as I understand, he said there was a piece off of the elbow. It was rough, the surface, and still is. I examined it yesterday, the surface of the bone on the tip of the elbow was rough and it feels like there is a small fragment floating around in there. It is still swollen. (Three months after April 22, 1950.) Possibly, if the force had been sufficient, and had been numerous enough blows, or whatever caused the bruises, could have caused death."

In this connection counsel for appellant call our attention to the fact that the court instructed the jury that one of the elements of the crime charged was "that John F. Cullen was beaten by T. Kyle Woodward." So counsel argue that "beating" does not include the use of the feet, and the court by its instruction eliminated from the consideration of the jury all testimony as to the use of the latter. It is true that it has been said that "beating" includes any unlawful imposition of the hands and arms. Lowry v. State, 8 Ga. App. 379, 69 S.E. 34, Yarbrough v. State, 17 Ga. App. 828, 88 S.E. 710, 711. But that does not necessarily mean that it does not include something more. The Century Dictionary gives one of its meanings as "tread upon." It is doubtless true that we ordinarily refer to the use of the hands or fists when we speak of beating a man. But language frequently is not used accurately. It is sometimes used to confuse. To get its exact meaning we must consider the context and the connections in which it is used. There is no indication that the court meant to eliminate the use of feet by defendant in the case at bar from consideration by the jury, or that it was thus understood. We think that the objection here considered is too technical.

What constitutes grievous bodily harm is ordinarily a question for the jury. State v. Gaularpp, 144 Minn. 86, 174 N.W. 445. "The intent in such cases is a question of fact for the jury, and the malicious intention is to be inferred from the situation of the parties, their acts and declarations, the nature and extent of the violence, and the object to be accomplished." 4 Am. Jur. 142. The subject is considered in 6 C.J.S. 936 and 5 C.J.S. 733, 734, where a number of cases thereon are cited. In State v. Huntley, 91 N. C. 617, an assault and battery with an ordinary switch upon a woman which caused physical pain and which was "severe for a day or two, and more or less for several days" was held to constitute grievous bodily harm. In State v. Bowers, 178 Minn. 589, 228 N.W. 164, it was held that the infliction of bruises and marks on complainant's wrist and elbow and a cut on the forehead, which resulted in a scar, amounts to grievous bodily harm. In that case the court stated as follows: "The serious question on the evidence is whether it was sufficient to justify the jury in finding, beyond a reasonable doubt, that the injury inflicted on the young woman constituted grievous bodily harm. The word 'grievous' has been defined as meaning; Causing grief or sorrow; painful; afflictive; hard to bear; offensive; harmful. As used in this penal statute, the words 'grievous bodily harm' mean an injury of a graver and more serious character than an ordinary battery or assault in the third degree. The injury complained of consisted of bruises and marks on complainant's wrist and elbow and a bruise or cut on her forehead, causing discolorations which remained for some three weeks. The wound on the forehead was from half an inch to an inch long and a scab formed over it. It resulted in a scar which could be observed at the time of the trial, a little over a year after the injury. There was a severe struggle, and complainant suffered pain and headaches for two weeks or more. What is grievous

bodily harm is ordinarily a jury question. State v. Gaularpp, 144 Minn. 86, 174 N.W. 445. The court clearly submitted the question to the jury and permitted them to find defendant guilty of assault in either the second or third degree. We conclude that there was evidence sufficient to justify the jury in finding assault in the second degree. Taking the evidence as a whole, it sufficiently sustains the verdict."

In the case at bar, the defendant had a ring on his finger with which a cut on complainant's head was probably caused and which might have been more serious than the result which actually followed. The bruises on the chest seem to have been rather severe. Complainant apparently had two loose teeth as a result of defendant's acts. Complainant's elbow was still swollen three months after the assault by the defendant. We think that whether or not the injury inflicted in the case at bar constitutes grievous bodily harm was a question for the jury. We cannot say the contrary as a matter of law.

Counsel for appellant say much in their brief about the rules of hospitality. They think that Cullen did not manage well in getting the defendant to leave his house; that he had no right to use more force than was necessary to eject the defendant; that he should not have hit the defendant with a bottle. It may be that he did not use the best judgment in getting the defendant out of his house, but it is sometimes difficult to know how best to handle a man who is intoxicated and whose disposition in that condition is vicious. In any event when a man enters another man's home as an intruder in the way the defendant did in the case at bar and conducts himself in such barbarous manner, and a manner so apparently utterly senseless, as shown by the evidence in this case, he can hardly expect much consideration at the hands of the court. Defendant's conduct seems particularly senseless in view of the fact that the parties

hardly knew each other, and had had no previous quarrel.

### 3. ADMISSIBILITY OF TESTIMONY.

As we have heretofore said, Mrs. Bordeaux was permitted, over objection, to testify to statements that were made in Cullen's house on the morning of April 22, 1950, when the struggle between Cullen and the defendant took place. Mrs. Bordeaux did not identify the voices and it is contended that the admission of her testimony was reversible error, counsel citing us to State v. Parmely, 65 Wyo. 215, 199 Pac. (2d) 112. In that case the defendant was convicted of assault and battery with intent to kill and murder one Wayne Messmer. The latter was not present at the trial but was in a hospital in California. To excuse Messmer's absence the State had the assistant county attorney testify that he had a conversation with Messmer, and also with his . physician, in which the latter stated that Messmer could not be moved from the hospital for two or three months. We held that the testimony was inadmissible because it was hearsay and because the voice of the doctor was not identified. The decision was right, but has no bearing on this case. The point involved was entirely different from the point involved in the case at bar. Everything that took place at the time of the affray, including what Mrs. Bordeaux heard was part of the res gestae. Underhill's Criminal Evidence (4th Ed.) 347-350, 22 C.J.S. 1044. What was said by one or the other of the parties to the affray was, under the circumstances, necessarily a question for the jury to determine.

### 4. INSTRUCTIONS.

Counsel for appellant make various complaints in connection with the instructions which were given by the court. No exception was taken to these instructions. We have held at various times that ordinarily instruc-

tions will not be reviewed on appeal, unless they are excepted to when given. Long v. State, 15 Wyo. 262, 88 Pac. 617, State v. George, 32 Wyo. 223, 231 Pac. 683. Counsel argue as did counsel in State v. Koch, 64 Wyo. 175, 189 Pac. (2d) 162, as to the duty of the court in giving instructions to the jury. In that case we said: "Counsel for defendant seem to think that the court must always at its peril give correct instructions, whether objected to or not. But counsel are wrong. It is said that 'generally, it is not only the right but also the duty of accused to raise objection if he wishes to take advantage thereof.'" Our cases are in accord with the rule generally prevailing. 24 C.J.S. 602. In 23 C.J.S. 1002, it is stated: "As a general rule, objections and exceptions to charges given, or to failure or a refusal to instruct as requested, will be regarded as waived unless they are taken immediately after the ruling is made or after the court charges the jury and before they retire, unless * * * the error is of jurisdictional or fundamental character * * *." We do not find any fundamental error in the instructions given by the trial court. Counsel for appellant seem to think that it was a fundamental error when the court stated in instruction No. 5 as follows: "* * * but you may convict him of aggravated assault and battery or assault and battery." However, that statement is merely in accordance with § 10-1403, Wyo. Comp. Stat. 1945, where it is stated: "Upon an indictment for an offense consisting of different degrees, the jury may find the defendant not guilty of the degree charged, and guilty of any degree inferior thereto." Counsel also argue that the court did not define the offense for which the defendant was convicted. We think they are clearly in error in that connection. The court in instruction No. 10 stated as follows: "The Jury is instructed that if any person shall unlawfully and maliciously inflict upon another person, either with or without any weapon or instrument, any grievous bodily

harm, or shall unlawfully or maliciously cut, stab or wound any other person, the person so offending shall be deemed guilty of aggravated assault and battery." This instruction follows the language of the statute. It is said in 23 C.J.S. 742 that "when the offense is statutory it is generally proper and sufficient to give the definition in the language of the statute." If the defendant had desired the court to give a more specific instruction, he should have asked the court to do so. That was not done.

The defendant asked the court to give the following instruction, to-wit: "YOU ARE INSTRUCTED that where an assault and battery is committed which does not result in the death of the person assailed, there is no presumption that the assailant intended to kill; and YOU ARE FURTHER INSTRUCTED that in the absence of evidence to the contrary, the presumption is that the assault was made with the intention to accomplish only that which actually resulted."

The instruction was evidently based upon what this court said in Ivey v. State, 24 Wyo. 1, 10; 154 Pac. 589, as follows: "In the absence of evidence to the contrary the presumption is that the assault was made with the intention to accomplish that which actually resulted from the assault. But where an assault is thus committed, but which does not result in death, there is no presumption that the assailant intended to kill, that is to say, the presumption arising from the character of the assault with reference to the intent with which it is committed, goes only to the result accomplished, and there is no presumption that he intended to do more than was actually accomplished. So, where the charge is that an assault was made with the intent to kill and when death did not ensue, it is error to charge the jury that the presumption is that he intended the natural and probable consequences of the assault." That state-

ment was approved in State v. Parmely, 65 Wyo. 215, 199 Pac. (2d) 112.

It would accordingly seem that the requested instruction correctly stated an abstract principle of law, but, whether or not it was prejudicial error not to give the instruction is another matter. No exception was taken. This court has held that the refusal to give requested instructions is not reviewable in the absence of an exception taken at the time. Gunnell & Elder v. State, 21 Wyo. 125, 128 Pac. 512. See also McAdams v. State, 23 Wyo. 294, 149 Pac. 550. Aside from that however, it is a general principle of law that an error in failing or refusing to give a particular instruction is ordinarily harmless and not grounds for reversal unless the accused has been prejudiced thereby. 24 C.J.S. 1038. Thus it has been held in numerous cases that an accused cannot complain of an error in an instruction as to a higher degree of the crime, where the accused is convicted of a lower degree. 24 C.J.S. 1037. The same principle should apply, of course, in connection with the failure to give an instruction. Thus it was held in People v. Kimmerle, 90 Cal. App. 186; 265 Pac. 525, that the refusal of an instruction in connection with the crime of mayhem was not prejudicial where the defendant was acquitted of that crime, but was convicted of the crime of inflicting great bodily injury. In State v. Eldredge, 45 Wyo. 488, 21 Pac. (2d) 545, we held that where a defendant was convicted of second degree murder, he was not prejudiced by giving or refusal of instructions relating to first degree murder. The opinion states: "Inasmuch as the defendant was not found guilty of that crime (first degree murder), it is obvious that he was not prejudiced by the giving or refusal to give instructions relating thereto. Ross v. State, 8 Wyo. 351, 387, 57 Pac. 924, Downing v. State, 11 Wyo. 86, 70 Pac. 833, 73 Pac. 758." The defendant was not convicted of an assault and battery with intent to kill, referred to in the instruction

which was asked, but of a crime of lower degree. The failure accordingly to give the instruction was perfectly harmless. We might, in this connection, mention the fact that counsel say that instructions given by the court were inflammatory when instructing what was necessary to be shown in finding the intent to kill. We find nothing inflammatory in the instructions. But, if they were, it is quite apparent that the jury, in view of their verdict, paid no attention to them and hence no harm whatever resulted.

5. SENTENCE.

The contention is that the sentence of the court was excessive. § 9-210 Wyo. Comp. Stat. 1945, provides that a person convicted of aggravated assault and battery shall be fined not more than $1000.00 or confined in the county jail not more than one year, or both. It is quite apparent that the penalty assessed by the court in the case at bar was much less than that warranted by our statute and we see no grounds for interfering with the sentence imposed by the court.

We have examined all of the contentions made in the case by counsel for the appellant with a great deal of care. We can find no reversible error in the record and the judgment of the district court must accordingly be affirmed. It is so ordered.

*Affirmed.*

RINER, J., and ILSLEY, J., concur.