## STATE OF HAWAII *v.* JOHN FRANKLIN GAGER AND DOUGLAS BENJAMIN HISTO.

### No. 4204.

MARCH 30, 1962.

TSUKIYAMA, C. J., CASSIDY, WIRTZ,
LEWIS AND MIZUHA, JJ.

OPINION OF THE COURT BY WIRTZ, J.

John Franklin Gager, Douglas Benjamin Histo, Leroy Samuel Oliveira and Andrew Fuchs were jointly indicted on October 8, 1959, for raping Charlene Berg on September 13, 1959. They were jointly tried by a jury which found appellants Gager and Histo guilty of attempted rape while acquitting the other defendants. From the judgment and sentence imposed on July 15, 1960, appellants have brought this appeal.

On the evening of September 12, 1959, at about 6:00 P.M., the complaining witness and her husband went to the Blaisdell Hotel in Honolulu. While at the hotel they had two rounds of alcoholic drinks. They then proceeded to the Pub on Nuuanu Avenue, a liquor establishment, to meet two or three marines invited by Mr. Berg earlier in the day to join them. Mrs. Berg had two drinks at the Pub and then the party proceeded to the Ginza, another liquor establishment, to see the floor show. Mrs. Berg went along although she did not care to see the floor show. At the Ginza, Mr. and Mrs. Berg had a violent disagreement about the show with the result that she left the party and returned by herself to the Pub within 10 or 15 minutes. Thereafter, while at the Pub she consumed a prodigious amount of alcohol. According to the testimony of a bartendress at the Pub, who had observed Mrs. Berg on this evening, she had more than 20 drinks from the time of her return to the Pub until she left early the next morning. Although Mr. Berg and the marines also

returned to the Pub later in the evening after viewing the floor show at the Ginza, they ignored Mrs. Berg and left without talking to her. At about 1:45 A.M., on the morning of September 13, 1959, Andrew Fuchs came to the Pub and sat next to Mrs. Berg at the bar. He struck up a conversation with her after having bought her something to drink. Shortly thereafter at about 2:00 A.M., Mrs. Berg went with Fuchs to still another liquor establishment, the Swing Club, and remained there for about an hour until the placed closed at about 3:00 A.M. While there they had several rounds of alcoholic drinks.

Appellants and Samuel Oliveira were at the Swing Club while Mrs. Berg and Fuchs were there. Oliveira and appellant Histo were together and later were joined by appellant Gager. Mrs. Berg was warned by the assistant manager of the Swing Club on several occasions to return to her escort as she was "table-hopping." The testimony of a barmaid revealed that Mrs. Berg was pestering Oliveira and appellant Histo at their table even to the point of sitting on Oliveira's lap. When Gager (also known as "Junior") joined them, he recognized Mrs. Berg as a previous acquaintance.

After the Swing Club closed, Mrs. Berg, Fuchs and Oliveira hailed a taxi cab and went to Diamond Head Beach Park. Appellants, on their own initiative, followed in another car. Mrs. Berg testified that at the beach all four had forceful sexual intercourse with her against her consent and against her will.

After leaving the beach area, Mrs. Berg went to a house on the road leading from the main highway to the beach and knocked on the door but no one answered. This was corroborated by the testimony of the occupant. She then walked to the highway and managed to get a ride from there to her home. She reported her experience to her husband upon her arrival at home at 5:00 A.M. She

then took an aspirin and a bath and went to bed. About five hours later upon awakening, Mrs. Berg went to the police station with her husband and reported the incident.

Assistant Chief of Police Leon Straus testified that he interviewed appellant Gager on the afternoon of September 14, 1959, between 2:00 and 2:30 P.M. At that time he asked Gager whether he did or did not have intercourse with Mrs. Berg. Appellant Gager replied that "I tried to have intercourse but I gave up because she struggled too much."

Detective George Kishi testified that he interviewed appellant Gager on two occasions. The first was a preliminary interview and the second for the purpose of securing a stenographic written statement. During the preliminary interview, Gager told Kishi that he got on Mrs. Berg without taking his pants off; that he exposed his penis through the opening in his pants; that he tried to insert his penis into her but he could not get an erection; that she recognized him and said "Oh, no, Junior, not you;" that he tried for about 30 seconds then got off. In the written stenographic statement Gager stated that "she saw me and saw who it was and started to struggle." At that time he was kneeling over her, his trousers were unzipped and his penis pulled out. He further said in his statement: "After the girl recognized me, I got off." When asked whether Mrs. Berg was the one that he attempted to have sexual intercourse with on the morning in question, he replied "That is correct."

Detective Kishi also testified that he interviewed appellant Histo on two occasions. During the preliminary interview, Histo told Kishi that when he approached Mrs. Berg at the beach he had already removed his trousers and was wearing only bathing shorts; that he unbuttoned the shorts, "got on her and tried to insert his penis into her, but did not have the feeling and could not get an

erection;" that she cooperated and did not object to his trying to use her; that when he started to get up she pulled a crucifix from a chain around his neck, breaking the chain, and calling him a "nigger." In the written stenographic statement received from Histo he stated that he tried to have sexual intercourse with Mrs. Berg but "couldn't get the hard-on;" that "she said it would be better in a car so we could be comfortable."

Defendants Andrew Fuchs and Samuel Oliveira took the witness stand but neither of the appellants did so. Fuchs testified that he had asked Mrs. Berg for sexual relations and had obtained a favorable answer but that at the beach he could not attain an erection and consequently did not have sexual intercourse with her.

In substance, Oliveira testified that Mrs. Berg played up to him while they were at the Swing Club; that he was with Fuchs and Mrs. Berg on the ride out to the beach; that he did have sexual intercourse with her, but with her consent.

Preliminarily, it should be pointed out that the Opening Brief filed by appellants is not in compliance with Rule 3(b) of this court. While issues were framed under a section entitled ISSUES INVOLVED, there is no statement there, or in the specifications of error, or anywhere in the brief, of the manner in which the questions or issues involved were raised. See Rule 3(b)3. The specifications of error are inadequately set forth. Rule 3(b)4 requires "the particulars of each error intended to be urged." No citations to the record were furnished. The part of the charge to the jury complained of was not set out in *totidem verbis,* together with objection urged in the court below. This court has probably been too patient in the past with deviations from its rules and serves notice that it will require compliance in future briefing.

The jury were instructed, by agreement, that, as to

each of the defendants, they could bring in any one of the following verdicts: (1) Guilty as charged; (2) Guilty of assault with intent to rape; (3) Guilty of attempted rape; (4) Guilty of assault or battery; or (5) Not Guilty. (State's Instruction No. 25.) They were also instructed in the language of the statute that "an attempt to commit an offense is some act done towards commiting and in part execution of the intent to commit the same—for example, putting poison in the way of a person, with intent thereby to murder him." (R.L.H. 1955, § 248-1. State's Instruction No. 27.)

Although defendants agreed to the above instruction, the point was raised during argument as to whether or not attempted rape is a lesser included offense of rape in view of our statute defining assault with intent to rape. Necessarily, any assault with intent to rape is attempted rape but the fact that the legislature defined one particular type of attempted rape does not preclude there being other types varying in the degree of execution of the intent to commit rape, although not constituting assault with intent to rape. The general statute concerning attempts is of the same force when applied to any offense as if it were especially enacted in the statute creating such offense. *Rex* v. *Kaimano,* 3 Haw. 565; *Territory* v. *Wong,* 30 Haw. 819. The words "attempt to commit rape," in their ordinary meaning are not equivalent to the words "assault with intent to commit rape," since "the former phrase may describe a state of facts which does not constitute an assault with intent to ravish." *Fox* v. *State,* 34 Ohio St. 377, 379. To like effect see *Burton* v. *State,* 8 Ala. App. 295, 62 So. 394; *Taff* v. *State,* 69 Tex. Crim. 528, 155 S.W. 214; *State* v. *Hyams,* 64 Utah 285, 230 Pac. 349; *State* v. *Hetzel,* 159 Ohio St. 350, 112 N.E.2d 369; *State* v. *Smith,* 90 Utah 482, 62 P.2d 1110. Although it is unnecessary to rule on this question, as it was in-

vited error, if any, it might be well to note that the distinction between an assault with intent to commit rape and an attempt to commit rape has been long recognized in Hawaii under similar instructions given to the jury relative to alternative verdicts returnable under a charge of rape. *Territory* v. *Hamilton,* 39 Haw. 14.

On the question of the sufficiency of the evidence to support the verdict, appellants first contend that it was inconsistent with the evidence. Reliance is placed upon *Territory* v. *Thompson,* 26 Haw. 181, which stands for the proposition, succinctly stated in the headnote thereto, that where several persons "are jointly indicted and tried together for the same alleged offense and the evidence in effect is *in every respect the same against all of them and diametrically in conflict with the evidence in their favor* a verdict finding one guilty and the [others] not guilty is inconsistent and invalid and will be set aside." (Emphasis added.)

Such contention, however, is not applicable here as the evidence is not the same against all, unless only the testimony of the complaining witness is considered. If her testimony in its entirety was given full credence by the jury it could have been sufficient to secure a conviction of rape as to each defendant. But the jury may not have believed her testimony in full, but only insofar as the same was corroborated. They may have believed that she was an unfaithful wife who, to conceal this, was coloring the portions of her testimony concerning the two defendants whom she voluntarily accompanied to the beach. The jury were instructed that "the circumstances surrounding the parties at the time must be such as to point to the probable guilt of the accused or at least corroborate indirectly the testimony of the complaining witness" and that if any witness was found to have falsified his testimony the jury had "a right to reject the testimony of such

witness except insofar as the same is corroborated by other credible evidence or believed by you to be true." The evidence, considered in this light, was still sufficient to support the conviction of appellants of attempted rape.

In view of all the evidence, the acquittal of Fuchs and Oliveira was not inconsistent. The jury could justifiably have found from the evidence that Fuchs and Oliveira, who had escorted Mrs. Berg to the beach and had petted and fondled her on the way and had likewise led up to intercourse by further kissing and petting and fondling while at the beach, had thereby secured her consent and approval of their actions. On the other hand, appellants were interlopers who followed in a separate automobile and "crashed the party," as it were.

In convicting appellant Gager the jury could have believed that he did tell Assistant Chief of Police Straus, as testified, that he "tried to have intercourse with her but [I] gave up because she struggled too much." They could have considered this in connection with his stenographic statement when he was asked whether Mrs. Berg fought with him and he answered "No, she didn't fight with me, she saw me and saw who it was and started to struggle." Mrs. Berg corroborated this evidence in that she testified that she recognized him and told him to get off her and leave her alone. The jury was justified in believing her further testimony that he wouldn't get off and she tried to push her legs together but was not able to do so, while disbelieving his version that he got off when she told him to.

In connection with the finding of Histo's guilt, the jury could have believed that he did make the pre-trial statements to the effect that he tried to have sexual intercourse with Mrs. Berg but could not attain an erection and that this was true. They could nevertheless have believed her testimony of forceful acts against her and have

disbelieved his version of the incident in his pre-trial statements to the effect that she encouraged him. This, in view of her obvious distaste for colored persons, in which class she included the appellant Histo, as reflected by her testimony, and in the light of her corroborated statement that she tore his crucifix off, breaking the chain while calling him a derogatory name attributed by her to his supposed race.

It was understandable for the jury to place more reliance upon the testimony of Oliveira and Fuchs who accompanied Mrs. Berg to the beach in the taxi cab than in the pre-trial statements of appellants who were, at best, intruders. The jury apparently concluded, supported by the evidence, that the appellants who were not invited to the beach, would have effected forceful sexual intercourse against the consent and will of Mrs. Berg but for their inability or change of mind.

As stated in *Territory* v. *Noguchi*, 38 Haw. 350, 353:

> "If the assault is actually begun and the intent can be inferred from the acts committed, the offense is complete, notwithstanding that the assailant thereafter for some reason may relent and forbear the consummation of his purpose."

This would be true in the case of any attempt to rape.

The fact that the evidence more clearly pointed to assault with intent to rape, and was even sufficient to support a conviction of rape, can hardly prejudice appellants in their conviction of a lesser charge than the law and evidence warranted. The lesser charge in this case was submitted to the jury under instructions agreed upon by the appellants. One found guilty of a lesser offense included within a greater offense charged will not be heard to complain where the evidence would have justified a verdict of guilty of the greater offense. *People* v. *Gebbia*, 138 Cal. App. 94, 31 P.2d 822; *People* v. *Alderson*, 105

Cal. App. 202, 287 Pac. 362; *Terrell* v. *State,* 176 Ark. 1206, 2 S.W.2d 87; *Hallmark* v. *State,* 22 Okla. Crim. 422, 212 Pac. 322; *Cf., York* v. *State,* 34 Ala. 188, 39 So. 2d 694; *Berness* v. *State,* 40 Ala. 198, 113 So. 2d 178; *State* v. *Woodward,* 69 Wyo. 262, 240 P.2d 1157; *Cf., Territory* v. *Wong Pui,* 29 Haw. 441; *Territory* v. *Hamilton, supra.*

Further appellants contend that the verdict was so inconsistent as to show it was reached on the basis of passion or prejudice. As we have seen, the verdict was not inconsistent and was supported by the evidence. It is only where the verdict is found not to be supported by the evidence that the question of passion or prejudice of the jury arises. 24 C.J.S., *Criminal Law,* § 1452. The general rule is that where the jury returned a verdict of guilty and the verdict was based upon evidence which the law recognizes as sufficient the verdict cannot be disturbed. *Territory* v. *Barques,* 25 Haw. 521. Here, there is an absence of any indication whatsoever that the verdict was influenced by passion or prejudice, such as was clearly shown in the cases cited by appellants which are distinguishable in fact.

On this question of prejudice and passion, appellants also contend that "the trial should not have been held in the then prevailing atmosphere" and the court should have granted a continuance until later in the year. In this connection they argue "that the month of June, 1960, was not the most propitious time to hold an impartial rape trial" in that "community opinion was strongly against persons accused of rape."

Following the indictment in October of 1959, the case was set for trial on two occasions earlier in 1960, but was later continued to May 27, 1960. On April 29, 1960, defendants moved for a further continuance. A hearing was held and the court set the trial date for September 12, 1960. On May 10, 1960, a hearing was held on the prose-

cution's motion to advance the trial date and at the conclusion of that hearing the case was re-set to commence on June 1, 1960.

There is nothing in the record to indicate any prejudicial climate of public opinion as contended by the appellants except the self-serving statements of counsel in argument to the trial judge and the latter's remarks on April 29, 1960, to the effect that "trying a rape case at this time or in the near future is out of the question" and "I don't think it is fair to try any rape case in the near future."

Eleven days later on May 10, at the hearing on prosecution's motion, the trial judge advanced the trial date to June 1 because prosecutrix was about to leave the state. The trial judge thus reversed his previous ruling that the lapse of one month—the month of May—would be insufficient to dissipate the allegedly prejudicial community feeling. We are asked to hold that his previous ruling could not be reversed, on no better basis than the fact that he had once so ruled. For all we know, the allegedly prejudicial community feeling may well have dissipated in the meantime as the trial judge no longer appeared to be concerned with any prejudicial climate of public opinion.

The granting of a continuance is within the discretion of the trial judge and is not reviewable except for abuse of that discretion. *The Queen* v. *Ah Kiao,* 8 Haw. 466; *Territory* v. *Van Dalden,* 33 Haw. 113; see also Annotation, 39 A.L.R.2d 1321-1324. Appellants concede that this is the general rule but suggest that there is a national judicial trend otherwise, citing *United States* v. *Florio,* 13 F.R.D. 296, and *Delaney* v. *United States,* 199 F.2d 107. In those cases there was evidence before the court of extensive publicity, not only in the press but over the air waves and on television, just prior to, and at the time

of the trial, directed against the defendants personally. Nothing comparable has been shown in this case. Also in the *Delaney* case, there was evidence of a congressional investigation covering the same subject matter as the charge for which the defendant was to stand trial which stimulated widespread publicity. Since this prejudicial publicity was stimulated by the government itself the court was moved to state that the government was in a position where it would have to elect between proceeding against the defendant by the legislative department or by the judicial department and by not so electing had prejudiced the defendant's chances for a fair trial. It should be noted that in the *Florio* case, the motion for a change of venue was granted, obviating any question of abuse of discretion on the part of the trial judge.

Appellants cite the fact that more than 70 prospective jurors were excused and argue that this indicated the "general feeling in the community was against rape defendants." If we are to judge from the type of excuses exercised by 30 of them as recorded in the clerk's minutes, dealing with pregnancy, care of infant children, illness and the like, we could well assume that the remainder of the excuses, though unrecorded, were of a like nature. These were the types of excuses that would have been made in any type of trial and not necessarily in one where the charge was rape. They do not, in any way, reflect a general public feeling of resentment against the rape defendants.

We can only conclude, therefore, that the trial court properly denied appellants' motion for a continuance in granting the prosecution's motion to advance the trial date as there is nothing in the record to show an abuse of discretion.

In *Territory* v. *Young*, 32 Haw. 628, cited by appellants, the defendant was charged with rape and convicted

after a trial before a jury. Defendant assigned error in the trial court's denial of a new trial on the ground of "general, widespread newspaper prejudice concerning the public rape hysteria that existed and was prevalent in Honolulu, T.H., at the time of said trial which was short of lynch law." Defendant alleged, among other things, that the territorial newspapers commented on the pre-trial guilt of the defendant, and that the prosecutor gave a newspaper release that he was satisfied defendant was guilty. This court noted that there was no proof of any of the allegations as is the case here. The fact that defendant had waived his final peremptory challenge in that case was held to be "the equivalent of a statement, on behalf of the defendant, that at that time he was perfectly satisfied to go to trial before the twelve proposed jurors who were then in the jury box." 32 Haw. 636. It was also noted as significant that defendant failed to interpose a motion for a change of venue. In this case, likewise, appellants did not utilize all of their peremptory challenges nor did they move for a change of venue.

Finally, appellants in this court contend that there was insufficient evidence to justify the giving of State's Instruction No. 8 which reads as follows:

"Where a female is intoxicated to the extent of being unable to resist, the act of sexual intercourse is without her consent and is rape; but the intoxication must actually render her incapable of resistance, and not merely be such as to excite her passions.

"In this connection, you are further instructed that it is immaterial if you find that the complainant voluntarily consumed intoxicating liquors."

At the settlement of instructions before the trial court, while the question of the sufficiency of the evidence was argued it was not made the basis of the objection to this instruction. The objection to the instruction was that "it

fails to state therein that the intoxication must be such as to render the person mentally unconscious." At this stage appellants concede that the instruction given is a correct, even if an incomplete, statement of the rule of law but assert that it was not applicable to the facts shown in the present case.

An examination of the record discloses that there was sufficient evidence from which the jury might have found that Mrs. Berg was intoxicated to the extent of being unable to resist, and beyond mere excitement of her passion. Her own testimony as to the drinks she had during that evening, and the fact that she could not remember details when her recollection was sorely tried on cross-examination tended to show extreme intoxication. Oliveira testified and made statements concerning her unusual and peculiar actions which were hardly the actions of a sober woman or even of one who is slightly intoxicated. He also testified that she was unsteady on her feet and staggering when they left the Swing Club. A bartendress at the Pub testified that she observed her consuming in excess of 20 alcoholic drinks while there. This is apart from the number of drinks she had elsewhere. A barmaid at the Swing Club told of her near disorderly conduct in pestering the other customers, including appellants, and of sitting on Oliveira's lap. The assistant manager of the Swing Club was concerned about her disoriented conduct in connection with "table-hopping" and wanting to leave with others than her escort. All of this could have led the jury to the conclusion that Mrs. Berg, while apparently able to walk and talk, was actually "mentally unconscious." That she was "out on her feet," as it were, a common enough experience among heavy drinkers.

The evidence as to the 20 drinks at the Pub, was elicited by the defense with the evident purpose of showing that the complaining witness was intoxicated and

receptive to overtures by the defendants. When such evidence is brought out and goes so far as to show that the complaining witness may even have reached the point of no resistance in her intoxication, the defense is not entitled to have the latter theory withdrawn from the jury. *Cf., Cantu* v. *State* (Texas 1960), 341 S.W.2d 451. Far from assuming that the complainant was "intoxicated to the extent of being unable to resist," the instruction merely presented the question to the jury.

Appellants contend that in order to sustain a general verdict of guilty where the case has been submitted to the jury under two distinct theories as to the guilt of accused, the evidence must be sufficient to sustain a conviction under either. 20 Am. Jur., *Evidence,* § 1216, citing *People* v. *Sullivan,* 173 N.Y. 122, 65 N.E. 989. In the *Sullivan* case the court also quoted with approval from *Murray* v. *N. Y. Life Ins. Co.,* 96 N.Y. 614, that "it is not necessary that a jury, in order to find a verdict, should concur in a single view of the transaction disclosed by the evidence. If the conclusion may be justified upon either of two interpretations of the evidence, the verdict cannot be impeached by showing that a part of the jury proceeded upon one interpretation and part upon the other." 65 N.E. 989. The jury here could have found the appellants guilty of attempted rape under either the theory of force and resistance or intoxication in lieu thereof.

The verdict, actually four separate verdicts, acquitted defendants Fuchs and Oliveira while convicting appellants of attempted rape. It is not necessary to reconcile the overall verdict, acquitting defendants Fuchs and Oliveira while convicting appellants of attempted rape, on both theories advanced under the instructions to the jury. The only requirement is that there was sufficient evidence to justify the submission of both theories to the

jury. This was the focal point of the question in *People v. Sullivan, supra,* where the court stated that "* * * if as to either claim the evidence was insufficient to justify the submission of the question to the jury the conviction must be reversed * * *." 173 N.Y. 122, 126, 127.

In the present case the evidence justified the submission of both theories to the jury, as there was sufficient evidence to sustain the guilt of appellants under either theory. The verdicts of acquittal do not vitiate the verdicts of guilt, because reconcilable under the first theory as above set out.

Accordingly, we find that the evidence was sufficient to support the verdict of attempted rape and that there was no error prejudicial to the rights of appellants as contended.

Affirmed.

*John H. Peters,* Prosecuting Attorney and *Kenneth K. Saruwatari,* Deputy Prosecuting Attorney, City and County of Honolulu for Plaintiff-Appellee.

*Hyman M. Greenstein* ( *Greenstein & Franklin*) for Defendants-Appellants.

### DISSENTING OPINION BY MIZUHA, J.

At the request of the State, the lower court instructed the jury on two theories of law to negate the element of consent.

State's Instruction No. 6 properly instructed the jury as to what was sufficient on the part of the complaining witness as far as the element of resistance was concerned.

State's Instruction No. 8 was improper. It read:

*"Where a female is intoxicated to the extent of being unable to resist,* the act of sexual intercourse is without her consent and is rape; *but the intoxication must actually render her incapable of resistance,* and not merely be such as to excite her passion.*

"In this connection, you are further instructed that it is immaterial if you find that the complainant voluntarily consumed intoxicating liquors." (Emphasis added.)

The language of State's Instruction No. 8 is clearly inapplicable to the facts of this case. It assumes on the part of the court that there was evidence that the complaining witness was intoxicated to the extent of being "unable to resist," where there was none. If at all, there was conflicting evidence only as to whether the complaining witness was intoxicated. "The assumption of a fact in controversy, the ultimate determination of which is within the exclusive province of the jury, constitutes prejudicial error." *Territory* v. *Cutad*, 37 Haw. 182, 187. See also *State* v. *Wheeler*, 79 Mo. 366.

"Instructions in a criminal case are erroneous, and properly refused, which assume facts in opposition to the evidence in the case * * *." 1 Randall, *Instructions to Juries*, § 138 at 269-71.

"The trial court in charging the jury should never, either of its own motion or at the request of either party, give an instruction to the jury which assumes as true the existence or nonexistence of any material fact in issue in respect of which the evidence is conflicting or as to which there is dispute, or which is not supported by the evidence." 53 Am. Jur., *Trial*, § 605 at 477-78.

"The rule is universal that an instruction to a jury cannot be predicated upon assumed facts upon which there is no proof * * *." *Territory* v. *Corum*, 34 Haw. 167, 183. See also *McAndrews* v. *People*, 71 Colo. 542, 208 Pac. 486.

"The court shall instruct the jury regarding the law applicable to the facts of the case * * *." R.L.H. 1955, § 231-23.

"[T]he judge is authorized in criminal cases to make

such comment on the evidence and the testimony and credibility of any witness as in his opinion is necessary for the proper determination of the case. But this privilege has its inherent limitations. 'His discretion is not arbitrary and uncontrolled, but judicial, to be exercised in conformity with the standards governing the judicial office. In commenting upon testimony he may not assume the role of a witness. He may analyze and dissect the evidence, but he may not either distort it or add to it.'" *Territory* v. *Cutad, supra* at 184.

The detailed testimony of the complaining witness clearly indicates that she was not intoxicated to the extent of being unable to resist. She testified, with great clarity, as to the manner in which the defendants approached her and had sexual intercourse with her. Excerpts of her testimony from the record appear in the margin below.[1]

---

[1]Direct examination of the complaining witness with reference to defendant Oliveira:

"MRS. BERG: Then Oliveira held my arms while Fuchs pulled my *muu-muu* off. Then after they got my *muu-muu* off, the first thing I knew, I was on the sand.

"MR. SARUWATARI (Public Prosecutor): At that time who was present?
"A Oliveira and Fuchs.
"Q And yourself?
"A And myself.
"Q All right. You found yourself on the sand. What happened then?
"A The first thing I knew, Oliveira was on top of me. I tried to—he got on top of me and I tried to raise up my arms but I didn't get up. I couldn't get up.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"Q We're at a point where Mr. Oliveira was on top of you. Where was Mr. Fuchs, if you know?
"A I don't remember.
"Q What happened when Mr. Oliveira got on top of you?
"A He kept pushing his—jabbing his penis into me until he got it into me.
"Q Got it in where? What do you mean by 'got it in'?
"A He got it into my vagina.
"Q Will you tell the Court and jury, please, what you were doing and what he was doing?
"A When he got on top of me he spread my legs and he kept jabbing

She insisted that she resisted the efforts of each defendant. In reading the vivid description given by the complaining witness as to the events and conversations at the beach, it is rather difficult to arrive at the conclusion that she could have been "mentally unconscious" at the time and still be able to testify in the detailed manner she did during the trial.

One witness, a bartendress at the "Pub" where the

---

his penis into my vagina until he got it into me. And I tried to raise up on my arms but I couldn't get up.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

Direct examination of the complaining witness with reference to defendant Gager:

"A Gager got on top of me and I said, 'Sonny, not you. What are you doing here? Get off me and leave me alone.' But he didn't leave me alone and he wouldn't get off me. I tried to—the same with Oliveira, I tried to push my legs together, but I was unable to. He also pushed my legs apart with his hands and he kept jabbing his penis into me until he got it in me. And I kept telling him to get off me and leave me alone. But he didn't.

"Q You said you told him, 'Sonny, get off of me'?

"A Yes.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

"A (Continuing) While Sonny was on top of me I kept twisting my head from side to side and I happened to turn towards the right and I saw Histo coming toward me and I asked them to keep him away from me, keep him away from me. He kept coming toward me.

"Q Who kept coming toward you?

"A I hate niggers. I can't help it.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

Direct examination of the complaining witness with reference to defendant Histo:

"A While Gager was still on me, I happened to turn my head toward the right and I saw Histo coming toward me and I told them to keep him away from me.

"Q Who did you tell that to?

"A I told that to Gager but he didn't do anything, he didn't say anything. I kept telling him to keep him away from me; don't let him come near me. But they didn't do anything. And Histo kept coming toward me and as soon as Gager got off Histo got on me. And he kept jabbing his penis into me—into my vagina until he got it into me.

"Q What were you doing?

"A I tried to raise up on my arms but I couldn't.

"Q Will you proceed.

"A So while I tried to—I told him to get off me and leave me alone, but he didn't do anything.

"Q This is Histo you're talking about?

"A Yes.

"Q What else happened, if anything?

"A So I reached up and I found a chain around his neck and I grabbed

complaining witness had visited earlier in the evening, testified that she was "a fast drinker" and had had more than twenty drinks. On the other hand, an assistant manager of the "Swing Club," which was visited later, testified as follows:

"Well, I wouldn't say she was sober and I wouldn't say she was drunk. She had been drinking but *she*

---

it and yanked it off his neck. After that, after I yanked it off his neck, he said, 'You're going to get it.' And I told him, 'You're going to get it.' After I yanked the chain off his neck he said, 'Let's knock her off.' Then I heard someone say, 'Leave her alone.'

Direct examination of the complaining witness with reference to defendant Fuchs:

"Q Did anything else happen? Will you proceed.

"A While he was on me, Fuchs was standing nearby, and as soon as Histo got off, Fuchs got on me and he kept jabbing his penis into my vagina until he got it in me. And I told him to get off me and leave me alone. And I was crying and screaming and he put his hand over my mouth. He wouldn't take it away. He said if I would shut up he would take his hand away so I tried to stop screaming enough so that he would take his hand away, but he didn't. He kept his hand over my mouth. While he had his hand over my mouth, I bit him. I tried to get him off by raising up my arm, but I just couldn't. He kept his hand on my mouth the whole time he was on top of me, and I couldn't scream, I couldn't do anything. So finally, then he got off after a long time and I asked him where my damn clothes were and he went and found them. And I put my underpants back on and I asked him where my purse was and he gave me my purse and I found my shoes upside down in my purse.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

"Q While Fuchs was on you, is that all you recall that happened?

"A After Fuchs got off me I asked him where my clothes were. He went and found my clothes and I put my underpants on, and my *muumuu*. I put my stockings in my purse where my shoes were and I had to walk across some rocks with barnacles or something. And he asked me if he could help me and I said, 'No, leave me alone.' So, I got up to where the small road was and I kept swatting him in the face with my girdle and—

\* \* \* \* \* \* \* \* \* \* \* \* \*

"Q Then what happened?

"A When I reached the wall on the small road, I stopped and put my shoes on and he asked me if I needed any help and I told him, 'Keep away from me. Get away from me.' And then he started to walk away. And he left me there. After he left I went to this small house and knocked on the door and asked them if they would help me, but nobody would answer the door but I heard a small dog barking inside. So nobody answered the door and nobody came out so then I walked up to the wide highway and waited a few minutes. And then a car came by and the driver asked me if needed a lift home and I said yes. And I told him that I got raped and he asked me—"

*wasn't drunk enough where she didn't know what she was doing.* (Emphasis added.)

With reference to the state of intoxication of the complaining witness after leaving the Swing Club for the beach, defendant Oliveira[2] testified that she was "under the influence of alcohol," but defendant Fuchs[3] testified that she talked "very coherently" and "that her speech was not slurred." There was no other testimony as to the complaining witness' state of intoxication after leaving the Swing Club. Therefore, the evidence was in conflict only on whether she was intoxicated. There was no evidence that she was intoxicated to the extent of being "unable to resist" at the beach.

One of the principal evils of instructions assuming facts unsupported by evidence is their tendency to mislead and confuse the jury. This court in *Territory* v. *Cutad, supra* at 186 was constrained to make this statement:

"Observations based upon human experience are statements of fact. Instructions of the court are limited to the law applicable to the case. Any observation by the court upon matters of common experience pertinent to the facts would necessarily interject an additional element not warranted by the evidence. '* * * *deductions and theories not warranted by the evidence should be studiously avoided.'*" (Emphasis added.)

The emphasized portion of the above-quoted paragraph originated in *Burke* v. *Maxwell's Adm'r*, 81 Pa. St. 139, 153, where the court said:

---

[2]The defendant Oliveira also testified that the complainant had been "somewhat unsteady" and had staggered once at the beach, but attributed that to the fact that she was "a polio victim and wore an instep" and said it was not due to the fact "that she had had plenty to drink."

[3]Defendants Oliveira and Fuchs were acquitted.

"The evidence, if stated at all, should be stated accurately, as well that which makes in favor of a party as that which makes against him; *deductions and theories not warranted by the evidence should be studiously avoided; they can hardly fail to mislead the jury and work injustice.*" (Emphasis added.)

The condition of an alleged victim of rape relative to her state of intoxication bears on the issue whether the alleged acts were committed "against her will" under our statute. R.L.H. 1955, § 309-31.

In *Gore* v. *State,* 119 Ga. 418, 419, 46 S.E. 671, 672, the court, in discussing the "consent" element in the law of rape, states the following:

"The authorities generally, however, construe the words 'against her will' to be synonymous with 'without her consent,' and hold the act of sexual intercourse is against the woman's will when, from any cause, she is not in a position to exercise any judgment about the matter. Thus intercourse with a woman whose will is temporarily lost from intoxication, or unconsciousness arising from the use of drugs or other cause, or sleep, etc., is rape."

Thus, in order to constitute rape, the state of intoxication required is such intoxication that renders a woman insensible, helpless, unconscious or in a state of insensibility. 75 C.J.S., *Rape,* § 14(a); *Queen* v. *Camplin,* 1 Cox Crim. Cas. 220; *Commonwealth* v. *Burke,* 105 Mass. 376, 7 Am. Rep. 531; *Quinn* v. *State,* 153 Wis. 573, 142 N.W. 510; *People* v. *O'Brien,* 130 Cal. 1, 62 Pac. 297.

A corollary to the rule against giving an instruction assuming facts in opposition to the evidence is the principle that, in order to sustain a general verdict of guilty when the case has been submitted to the jury under two distinct theories as to the guilt of the accused, the evidence must be sufficient to sustain a conviction under

either. 20 Am. Jur., *Evidence*, § 1216. In *People* v. *Sullivan*, 173 N.Y. 122, 126-27, 65 N.E. 989, the court stated:

> "* * * the guilt of the defendant was submitted to the jury on both claims of the People, first, that the deceased was killed with a deliberate and premeditated design to effect his death, and, second, that he was killed by the defendant while the latter was engaged in the perpetration of a felony or an attempt to commit one, *if as to either claim the evidence was insufficient to justify the submission of the question to the jury the conviction must be reversed since it cannot be known on which ground the jury based its verdict.*"
>
> (Emphasis added.)

In the *Sullivan* case, *supra,* the court found that there was sufficient evidence to support a verdict under either theory. In the instant case if the State had relied solely on the theory of intercourse with a drunken woman "unable to resist" there is no doubt that State's Instruction No. 8 would have been refused and the evidence submitted as to the complainant's condition would not have justified sending the case to the jury.

It is further contended that a verdict of guilty of a lesser degree as attempted rape cures errors in instructions as to a higher degree. "[S]pecific intent in an attempt to commit the crime of rape embraces every element of the crime of rape except its accomplishment." *State* v. *Huffman,* 141 W. Va. 55, 80, 87 S.E.2d 541, 556. "Intent, which is essential to support a conviction of an attempt to commit rape, cannot be assumed, but must be shown by competent evidence, and beyond a reasonable doubt." *Hall* v. *State,* 67 Okla. Crim. 330, 353, 93 P.2d 1107, 1118. Although State's Instruction No. 8 is purportedly directed only at the charge of the higher crime of rape, it is also directly applicable to the charge of

attempted rape.[4] Unfortunately, there is no way of determining whether the jury based their verdict for attempted rape on the defendants' intent to have sexual intercourse with a woman so drunk as to be "unable to resist," or with a woman who was able to resist, or both.

Since there is a possibility that the conviction of attempted rape may be based upon the theory stated in State's Instruction No. 8 which is not supported by the evidence, the verdict should be set aside and a new trial granted.

[4]R.L.H. 1955, § 248-1, reads as follows: "*Attempt.* An attempt to commit an offense is some act done towards committing and in part execution of the intent to commit the same—for example, putting poison in the way of a person, with intent thereby to murder him."