THE STATE OF WYOMING,

*Plaintiff and Respondent,*

vs.

BYRON PARMELY,

*Defendant and Appellant.*

(No. 2384; November 9, 1948; 199 Pac. (2d) 112)

216

For Plaintiff and Respondent the cause was submitted on the brief of Norman B. Gray, Attorney General, John S. Miller, Deputy Attorney General and Marion R. Smyser, Assistant Attorney General, all of Cheyenne, Wyoming and oral argument by Mr. Miller.

For Defendant and Appellant the cause was submitted on the brief of R. R. Rose and J. F. Mahoney and oral argument by Mr. Mahoney and John J. McIntyre, all of Casper, Wyoming.

218

OPINION

RINER, Chief Justice.

Byron Parmely was convicted by the verdict of a jury in the District Court of Natrona County of the crime of assault and battery with intent to kill and murder a person named Wayne Messmer. The record is here for review on Parmely's direct appeal. He will usually be referred to hereinafter as the defendant.

Omitting formal allegations the defendant was charged by an information filed by the County and Prosecuting Attorney of Natrona County with having on or about August 21, 1946 in the aforesaid county, "wilfully and unlawfully and feloniously" committed a "violent injury upon the person of one Wayne Messmer, by then and there unlawfully, feloniously, purposely and with premeditated malice, shooting at and wounding the said Wayne Messmer with a gun which the said Byron Parmely then and there had and held in his hands, and which said gun was then and there loaded with powder and shot, with intent then and there and thereby, him, the said Wayne Messmer, unlawfully, feloniously, purposely and with premeditated malice, to kill and murder".

The law under which this information was drawn and filed August 21, 1946 is Section 9-206 W. C. S. 1945, which reads:

"Whoever perpetrates an assault, or assault and battery, upon any human being with intent to commit a felony, shall be imprisoned in the penitentiary not more than fourteen (14) years."

In connection with this statute it may properly be recalled that it has been held that Sections 9-208 re-

lating to assault, 9-209 relating to assault and battery, and 9-210 denouncing the crime of aggravated assault and battery are but inferior degrees of, and are included in, the offense described in Section 9-206 just quoted. Elliott vs. State, 47 Wyo. 36, 30 Pac. 2d 791. It may also be observed that this court in Brantley vs. State, 9 Wyo. 102, 107, 61 Pac. 139 referring to Section 5389 W. R. S. 1899 (now W. C. S. 1945 Section 10-1403) and quoting therefrom, its provision that:

"upon an indictment for an offense consisting of different degrees, the jury may find the defendant not guilty of the degree charged and guilty of any degree inferior thereto."

then proceeded to say:

"But counsel contend that this is no authority in the premises for the reason that assault with intent to commit murder in the first degree, murder in the second degree and manslaughter are not degrees of the same offense but separate offenses of the same degree and punishable in the same way. Our statutes upon the subject are taken from Indiana and the Supreme Court of that State construing the section in question say that 'a party indicted for an assault, or assault and battery, with intent to commit murder in the first degree, may, if the evidence justify it, be convicted of the assault, or assault and battery, with intent to commit murder in the first or second degree or to commit manslaughter, or he may be acquitted of any felonious intent, and found guilty of an assault, or assault and battery only.' The State v. Throckmorton, 53 Ind., 356. And it is evident that the construction of the section suggested by counsel is too narrow. For it is also the only express authority in our statutes for a verdict of manslaughter under an indictment for murder in the first degree. And yet manslaughter is no more a degree of murder, under our law, than assault with intent to commit manslaughter is a degree of the crime of assault with intent to commit murder in the first degree. It is not murder at all in any degree. It is simply an included offense, sufficiently charged in charging murder."

The material facts as we take them from the record are substantially as follows: On the night of August 20, 1946 the defendant with whom was associated his brother-in-law, Leland Carr, was conducting a restaurant and night club business in a place known as the Goose Egg Inn on the road between the cities of Casper and Rawlins, about 9.8 miles southwest of the first mentioned city and in Natrona County, Wyoming.

About 9:30 that night three men, Messmer, Coburn and Rogers, appeared in the Inn aforesaid and were observed by Parmely drinking at the bar of the establishment. One of them, Coburn, had been convicted of grand larceny in the State of Oklahoma and had served a term in the Oklahoma State Penitentiary in consequence. Shortly afterward, as they remained in the place, they became more or less under the influence of liquor, scuffled with one another, tipped over furniture and constantly used loud, vile and indecent language towards each other, the proprietor of the place, Parmely, and the guests of the restaurant who were there present. Later on Messmer engaged in a fight in the bar room. Then Coburn went outside the building and shortly thereafter two employees of the proprietor removed Messmer and Rogers from the room where the fight started and put them also outside of the building. Though excluded from the house, these three men continued nevertheless to cause trouble outside, constantly using vile language and threatening to fight those who had put them out. After these three men had been put out, the doors of the establishment were locked but the disturbers came and kicked on the doors. Parmely heard glass breaking and subsequently discovered that a window had been broken.

Soon thereafter these three men drove away in a motor car but presently returned. After that, defendant observed Messmer raising a window of the Inn

which had been closed, climbing part way through, and then going through the pockets of a coat which was hanging near the window frame and at the same time calling out that he, Messmer, wanted his wrist watch. Parmely walked toward Messmer and the latter immediately withdrew from the window. Parmely then closed the window sash and locked it. It seems that someone had found a wrist watch on the floor of the establishment some time during the course of the evening. The defendant, however, did not advise Messmer of this fact before the latter withdrew from the window. It also appears that at various times after the three men began causing these disturbances, the proprietor, Parmely, and his employees attempted to call the office of the Sheriff of Natrona County but were unable to reach him due to the fact that the telephone line strung on fence posts was out of order.

It appears there was a large party of guests at the Inn that night and some of them left early in the evening in consequence of the behavior of these three men. One of the guests who was accompanied by two women was struck on the back of his head and knocked to the floor by Messmer. Messmer did this when asked by this guest to refrain from the use of vile language as there were women present. Some of the guests, to aid the proprietor of the place, formed a line to enable other patrons of the place, including women, to safely leave the establishment and get to their car so that they might return to Casper.

These three men finally got in a car driven by Coburn and once more left the Inn premises. Before doing that, however, Messmer walked over to Parmely's truck in which the latter was at that time sitting where he was unobserved by Messmer and cut the two rear tires so that the compressed air would be released and the two tires go flat. Parmely also heard

Messmer call out "Don't forget us fellows. We'll be back and kill every one of you."

Immediately after these men left the second time, Parmely took his revolver and with several of his employees followed the departing car containing Messmer, Rogers and Coburn on the road toward Rawlins. Parmely used his brother-in-law's car in doing this. This following car presently caught up with these men in their car about three miles from the Inn. Parmely testified he fired several shots in the air to stop them and when they did so he got out of the car which he was driving and walked along side the car Coburn had been driving. He told Coburn that he knew the latter had not cut the truck tries but that Messmer had done so. The windows of the Coburn and Rogers car on the left side of which Parmely then stood were open. Parmely then stepped back to the rear left window of this car and as the record recites asked Messmer:

"A. . . . to get out of the car and come back to the sheriff's office with me, and at that time he took a pass at me, something like this, through the window. I remember seeing his head through the window, and I swung at his head. I remember I wanted to hit his head. My recollection I hit the side of his head, the gun bouncing down the side of his head, and the barrel hitting there some way.

"Q. Did Messmer have something in his hand?

"A. Yes, sir, long bright object. What it was I couldn't tell.

"Q. Did you discharge the revolver intentionally?

"A. No, sir, I did not.

"Q. Did you have any intention whatever of firing that gun?

"A. No, sir, not at a human being, sir, never.

"Q. You attempted to strike him?

"A. Yes, sir.

"Q. Because he struck at you some way?

"A. Yes, sir, just reflex as far as I can remember; it was so quick I remember coming down in a flash."

Parmely testified also that he was very much surprised and scared when the gun went off. Corroborating this statement Rogers as a witness for the State testified:

"Q. Now as a matter of fact, Byron Parmely seemed to be very much surprised, did he not?

"A. Well, yes, sir.

"Q. He seemed to be very much surprised when he found that Messmer had been shot, that true?

"A. Yes, sir."

The wound on Messmer upon examination by the physician in the Casper hospital was in the region of the collar bone.

Parmely then directed his employees to assist him to put Messmer in the rear seat of the car he had used to follow these men, drove back to the Inn and there told an employee to drive Messmer immediately to the hospital in Casper and call Doctor Fitzgerald to attend the injured man. This was done. The defendant remained at the Inn for a short time thereafter, gathered the rest of his employees and returned in a cab which had driven out to the Inn to his (Parmely's) home in Casper. Upon arrival there Parmely phoned the Sheriff's office, told him that he had shot Messmer and that he was waiting at his home for the Sheriff "whenever they wanted me". The defendant was shortly thereafter taken in custody by officers from the Sheriff's office and removed to the county jail. The defendant testified without objection that he was married, had three children, had served in the armed forces of the United States and had been honorably discharged. The record also shows that the defendant

paid the bill of the physician who at defendant's request attended Messmer in the Casper hospital.

Some of the facts outlined above were to some extent disputed in the testimony given but these were comparatively few and most of them involved immaterial matters.

The defendant complains that the District Court erred in admitting over his objection and exception certain testimony of the Assistant County and Prosecuting Attorney of Natrona County concerning a conversation had between this official and Wayne Messmer and another party who purported to be Messmer's physician. Complaint is also made of the court's overruling defendant's motion to strike this testimony. The official mentioned testified as a witness for the State that on March 11, 1947 he talked with Messmer over the long distance telephone, Messmer being at that time in a hospital in Van Nuys, California having been transferred to that place from a Denver, Colorado hospital; that Messmer told the witness he would be present at the trial of this case in Casper, Wyoming if the doctors would allow him to travel and that he had just been operated on. This witness then testified that he talked with Messmer's doctor whose name had been given him by Messmer and the doctor told him that he (the doctor) "had put on skin grafts over bedsores and he (Messmer) could not be moved for another two or three months". All this testimony was objected to and sought to be stricken out on motion made on behalf of the defendant on the ground that it was hearsay, but, as before stated, the court admitted it nevertheless.

Concerning this testimony the Attorney General in his brief says: "No doubt the testimony of what the doctor stated over the telephone was inadmissible" and that "The only possible effect the hearsay might

have would be to inflame the minds of the jury so as to lead them to return an unduly severe verdict." That official also says: "the only issues are concerned with the intent. And whether the jury found the intent to be to commit murder or only manslaughter would not affect the matter, since the crime is the same in any event, i.e., assault and battery with intent to commit a felony." This contention overlooks the fact that under the law and the court's instructions given in the case the defendant could have been convicted of assault and battery or aggravated assault and battery which are not felonies. It being conceded, and we think properly, that the effect of this testimony would be to induce the jury to "return an unduly severe verdict" the error in admitting the testimony becomes manifest.

This testimony was not only purely hearsay but it was also subject to another objection. The conversations were over the long distance phone and there was no proof that the county official knew or recognized the voice of the physician with whom the conversation was had. The usual rule in admitting in evidence a telephone conversation is that in the absence of some proof of the identity of the speaker the declaration is not competent; and also ordinarily the witness must recognize the declarant's voice. Underhill's Criminal Evidence (Fourth Ed.) Section 129 and cases cited. The same text says also that "The absence of a witness from the state . . . may not be proved by hearsay evidence." Page 961, Section 465.

The jury were given at the time they retired to consider the evidence in the case and determine what their verdict should be, four forms of verdict. These were (1) finding the defendant "guilty as charged in the information"; (2) finding him guilty of "aggravated assault and battery"; (3) finding him "guilty of as-

sault and battery" and (4) finding him "not guilty". At the conclusion of the trial they returned the first form above described, duly signed by their foreman.

Among the instructions given by the court to the jury for their guidance as to the law which should govern the case was Instruction No. 4 which told the jury that:

"You are instructed that the prosecution in this case, which is the State of Wyoming, is required to prove every material allegation of the information, beyond a reasonable doubt, before you can convict the defendant.

"The material allegations of the information are:

"1. That Wayne Messmer was shot by Byron Parmely in Natrona County, Wyoming on or about August 21, 1946.

"2. That the shooting was purposely done and with the intent to kill the said Wayne Messmer."

This was followed by instruction No. 4A which defined in the words of the statute the crime described in Section 9-206 W. C. S. 1945 quoted above. Then there was given instruction No. 4B which reiterated verbatim Instruction No. 4 supra but added to it these words:

"If the State has done so, it is not necessary that other facts or circumstances surrounding such proof as had been given on behalf of the State should be established beyond a reasonable doubt. Some of such facts or circumstances may be established by a preponderance of evidence or may not be established. It is not meant that it is incumbent upon the prosecution to establish every fact surrounding such testimony, as given beyond a reasonable doubt. All that is incumbent upon the prosecution is that all facts and circumstances taken together should establish the defendant's guilt beyond a reasonable doubt. If you are satisfied beyond a reasonable doubt from all the evidence in the case, of the defendant's guilt, you should find him guilty."

Upon examination of Instructions 4 and 4B in connection with the information filed in the case against the defendant it will be noted that nothing is said in these instructions concerning certain important elements which are an integral part of the felony of murder, the intent to commit which crime the information undoubtedly undertook to charge. The court in these two instructions appears to have omitted the decidedly material elements of premeditation and malice. The defendant was actually found guilty of having an intent to commit a felony some of whose essential and distinguishing elements the court appears to have overlooked. We are unable to determine from the record that appellant was not harmed by these instructions.

It is said in Morris vs. United States, 156 Fed. 2d 525 that:

"The classical practice is that the judge delivers the applicable law of the case, defining and explaining the offense charged against the defendant, and the jury thus being informed as to the exact law, which they must determine has been or has not been violated by the defendant, places its determination of the facts alongside the law and reports in the open court in a single verdict of 'guilty' or 'not guilty'. Sparf v. United States, 1895, 156 U. S. 51, 715, 15 S. Ct. 273, 39 L. ed. 343; 1 Randall, Instructions to Juries, §§ 1, 97, 118; Hughes, Criminal Law and Procedure, pp 693, 696."

In Croft vs. State, 117 Fla. 832, 158 So. 454 this was said:

"Where the trial court attempts to define the offense, for the commission of which an accused is being tried, it is the duty of the court to instruct the jury as to each and every essential element of the offense charged and a charge attempting to define the offense which does not cover material elements of the offense is necessarily misleading and prejudicial to the accused. It is equivalent to directing the jury that it is not

necessary for the state to prove any elements of the offense except those included in the definition by the court.

"To have the advantage of this right it is not necessary for the accused to request special charges covering the elements of the offense which have not been covered by the charge embraced in the definition given to the jury by the court of its own volition because, . . . it is the duty of the court to define to the jury the elements of the offense with which the accused is charged and such definition must be at least not misleading."

And the note in 169 A. L. R. 326 citing many cases reaches the conclusion that:

"Where the trial judge attempts to state to the jury the elements of the offense charged, it is clearly the general rule that unless the omission is rectified in other portions of the charge or unless the defendant has failed properly to raise or preserve the question at the trial, all of the material elements of the offense must be incorporated in the instruction, and a failure to include one or more of such elements is a ground for reversal of the conviction."

At the very least, the statements in these instructions undertaking to tell the jury what the "material" allegations of the information were, were, we think, likely to confuse the jury and lead them to an erroneous verdict.   See also 23 C. J. S. Section 1194 p. 742.

Exceptions were taken by defendant to the giving of Instructions 5C and 5E telling the jury in 5C that:

"If from the testimony you believe that the shot which struck Messmer was discharged unintentionally and accidentally, you are instructed that unless you believe beyond a reasonable doubt that the defendant did actually intend to fire the shot, you cannot find him guilty of assault with intent to commit involuntary manslaughter, unless you also believe beyond all reasonable doubt that the shot was discharged by the defendant in the commission of some unlawful act, or by culpable negligence, or criminal carelessness."

Instruction 5E was given in this language:

"You are instructed that although the information in this case charges the crime of assault and battery with intent to kill, that charge includes the lessor offenses of assault and battery with intent to commit involuntary manslaughter, aggravated assault and battery, and assault and battery."

Ewbank's Indiana Criminal Law (First Ed.) 583, Section 752 states that:

"There is no such thing as assault and battery with intent to commit involuntary manslaughter, because the intention to kill would prevent the crime from being involuntary; but an attempt to kill another upon a sudden heat without malice may constitute assault and battery with intent to commit voluntary manslaughter".

It is noted in 1 W. C. S. 1945, p. 955 in Annotating Section 9-206 supra that this statute is similar to Burn's Indiana Statute Section 10-401. See also Brantley vs. State supra.

The Supreme Court of Indiana in Thetge vs. State, 83 Ind. 126, 128 in considering a case where the jury found a defendant guilty of an assault and battery with the intent to commit involuntary manslaughter in reviewing the judgment below remarked:

"We have given an exact copy of the verdict, in our statement of this case. It is very clear, we think, that the jury intended, in and by their verdict, to find the appellant guilty, and did find him guilty, of an assault and battery with intent to commit involuntary manslaughter. Such an offense, if such it may be called, is wholly unknown to the law of this State, and certainly the indictment in this case did not charge the appellant with such offense. In State v. Throckmorton, 53 Ind. 354, this court said: 'Of manslaughter there are two kinds, voluntary and involuntary. It may be conceded that there can be no such thing as an assault, or an assault and battery, with intent to commit manslaughter of the involuntary kind' ".

It is hardly necessary to comment that instructions which do not embody a correct statement of the law are erroneous and should not be given. 16 C. J. 964; 23 C. J. S. 733.

Defendant complains of the giving of Instruction No. 6 to which he objected and excepted. That instruction states:

"The Court instructs the jury that the intent with which an act is done, is an act or emotion of the mind, seldom, if ever, capable of direct and positive proof, but it is to be arrived at by such just and reasonable deduction or inference from the acts and facts proved as the guarded judgment of a candid and cautious man would ordinarily draw therefrom.

"The law warrants the presumption, or inference, that a person intends the results or consequences to follow an act which he intentionally commits, which ordinarily do follow such acts."

Condemning the use of certain language in an instruction which was substantially the same as that contained in the last paragraph of Instruction No. 6 in Ivey vs. State, 24 Wyo. 1, 154 Pac. 589 and ordering a reversal of the judgment below, this court said:

"The specific intent to kill must be proved as any other fact in the case to the satisfaction of the jury. In the absence of evidence to the contrary the presumption is that the assault was made with the intention to accomplish that which actually resulted from the assault. But where an assault is thus committed, but which does not result in death, there is no presumption that the assailant intended to kill, that is to say, the presumption arising from the character of the assault with reference to the intent with which it is committed, goes only to the result accomplished, and there is no presumption that he intended to do more than was actually accomplished. So, where the charge is that an assault was made with the intent to kill and when death did not ensue, it is error to charge the jury that the presumption is that he intended the natural and probable consequenses of the assault."

And in Vallas vs. State, 137 Nebraska 250, 288 N. W. 818 the Supreme Court of Nebraska has announced the rule that:

"Where the defendant is charged with assault with intent to kill or wound, and the details of the shooting and the attendant circumstances in reference thereto are testified to by eyewitnesses, instructions with reference to the presumption of law on intent should not be given, and, if given, constitute prejudicial error. The presumption of law does not take the place of such evidence or lessen or shift the burden of proof."

In the case at bar there were eye witnesses present who testified as to what occurred at the time Messmer was injured.

It is unnecessary to discuss further the questions presented by this record. Sufficient has been said to indicate that we think the errors disclosed therein require a new trial of the case. While other specifications of error are argued extensively, they may not arise on a retrial. In concluding this opinion it may not be improper to state that after a careful review of all the evidence now presented to us, we find some considerable question in our minds whether it was shown beyond a reasonable doubt that the defendant intended to commit a felony at all.

The judgment will be reversed and the cause remanded for a new trial.

*Reversed and Remanded.*

KIMBALL, J. and BLUME, J. concur.