Gilbert GRABILL, Appellant (Defendant),

v.

The STATE of Wyoming, Appellee (Plaintiff).

No. 5313.

Supreme Court of Wyoming.

Dec. 12, 1980.

Michael H. Schilling, Appellate Counsel, Wyoming Public Defender Program, Laramie, Richard Wolf, Appellate Counsel, Office of Public Defender, Cheyenne, and Julie Nye, Senior Law Student, for appellant.

John D. Troughton, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Crim. Div., Allen C. Johnson, Senior Asst. Atty. Gen., Cheyenne, and Jerome F. Statkus, Deputy County Atty., Laramie County, for appellee.

Before RAPER, C. J., and McCLINTOCK, THOMAS, ROSE and ROONEY, JJ.

ROONEY, Justice.

Appellant–defendant was sentenced to a term of one to five years in the penitentiary after he was found guilty by a jury of violation of § 6–4–504, W.S.1977, child abuse of a person under the age of sixteen.[1] He contends error in six respects in appealing from the judgment and sentence of the district court. We affirm, but remand for correction of clerical error.

## SUFFICIENCY OF EVIDENCE

Appellant's first contention of error is that "[t]he evidence was insufficient for the case to go beyond the State's case in chief, to go to the jury, or to sustain the guilty verdict."

"The oft–repeated rule by which we test the sufficiency of evidence on appeal of a criminal matter is that we examine and accept as true the evidence of the prosecution, leaving out of consideration entirely the evidence of the defendant in conflict therewith, and we give to the evidence of the prosecution every favorable inference which may reasonably and fairly be drawn therefrom. Stated another way—it is not whether the evidence establishes guilt beyond a reasonable doubt for us, but rather whether it is sufficient to form the basis for a reasonable inference of guilt beyond a reasonable doubt to be drawn by the jury when the evidence is viewed in the light most favorable to the State. [Citations.]" *Harvey v. State*, Wyo., 596 P.2d 1386, 1387 (1979). See *Cloman v. State*, Wyo., 574 P.2d 410 (1978).

1. Section 6–4–504, provides:
   "Any adult who intentionally or in reckless disregard of the consequences causes violent physical injury or mental trauma to a child under the age of sixteen (16) or commits any assault or assault and battery upon the child to a degree as to require medical, psychological or psychiatric treatment to heal or overcome the injuries or damages sustained by the child, or who sexually molests a child under the age of sixteen (16) is guilty of child abuse and upon conviction shall be sentenced to the state penitentiary for a term of not more than five (5) years."

Gauged by this standard, the following is part of the evidence which was placed before the jury in the State's case in chief.

Appellant was living with Donna Snyder and together they had parented a child, Alysia, who was born on August 25, 1979. Donna Snyder returned home at 2:30 a. m. on October 31, 1979 and observed Alysia "sleeping like she normally does." Donna Snyder awakened at 6:45 a. m. She testified in part:

"Q. What, if anything, did you do after you awoken?

"A. I got up and got my son up; the baby [Alysia] got up at seven o'clock. I fed her, changed her, got my son off to school by eight and the baby and I both laid back down in my bed from eight until ten, and I woke and she was still sleeping. I took her in the front room with me and she woke up and she stayed awake until her eleven o'clock feeding, and I fed her once again.

"Q. Now, what were your observations of the baby at seven a. m.?

"A. She seemed fine to me.

"Q. And then at eleven o'clock on the 31st?

"A. She seemed fine.

"Q. You said the baby was up from ten until eleven or approximately?

"A. Yes, around there.

"Q. It was eleven o'clock that you fed her?

"A. Yes.

"Q. After you fed the baby, what did you do?

"A. At eleven?

"Q. Uh–huh.

"A. I just watched TV.

"Q. What did you observe the baby do, if anything?

"A. She was fine, she fell back to sleep a while later after she ate until I got a phone call from my son.

"Q. As a result of that phone call, what did you do?

"A. Well, my son needed his costume by one–thirty because he had forgot it for his halloween party, and the baby was

sleeping and I was about to call a cab. It was just a few minutes before one and the cab number was busy, and just as I was hanging up, Gill [appellant] pulled up so I told him what I had to do.

"Q. What, if anything, did you do then?

"A. I took the car and I told him that if I wasn't back by three, because I had some grocery shopping to do, to feed the baby at three, she would eat at three.

"Q. So then is it your testimony that when you left–

"A. I left at one o'clock.

"Q. One o'clock?

"A. Yes.

"Q. And then, if you know, was the baby sleeping at that time?

"A. Yes, I believe she was.

"Q. Okay. Then you left at one, and then why don't you please tell the jury what you did.

"A. I left at one o'clock, I took my son his halloween costume and I went to Safeway and did my shopping, and I was back by about quarter to three.

"Q. Okay. What, if anything, happened when you came back at quarter to three?

"A. I had put the groceries away and sat down and asked Phil [sic] if she was still sleeping and he said, yes, and that she hadn't woke yet to eat, and he asked me about the bruise on her right ear.

"Q. What, if anything, did you say?

"A. I did not know where it came from. I was afraid to turn around and ask him the same question because there was one on her left ear two weeks prior to that.

"Q. Now, after he told you–how did he say that, that there was a bruise on the baby?

"A. I don't recall the exact words. He asked me, 'Did you notice the bruise on her right ear,' and if I knew where it came from.

"Q. And after he said that to you, what did you do?

"A. I looked at it and I said, 'No,' and it was worse than the one before.

"Q. I guess I'm not being clear on my questions. What did you observe when you looked?

"A. The bruise on the right ear and in back of it.

"Q. And then after you observed the bruise on the right ear, what, if anything, did you do at that time?

"A. I told him I didn't know where it had come from, and that's about as far as the conversation went about the bruise."

Alysia was taken to the Memorial Hospital in Cheyenne where she was attended to by Dr. Russell Williams. He testified she was comatose and:

"A. She did have a very unusual bruise about the right fleshy part of her ear and a semi–lunar bruise just behind the ear on the right side as well. This bruise was red with some purple discoloration and appeared to me to be fresh.

"Q. Was there anything additional that your examination disclosed?

"A. No–well, yes, her anterior fontanelle, the the [sic] soft spot, was quite tense, indicating that the brain was under increased pressure.

"Q. After examination of the baby, what was your diagnosis at that time?

"A. Well, it was my feeling that the baby was a victim of nonaccidental trauma and that she had sustained a severe brain injury. I had the benefit at the time of knowing of some of the things that we worry about when a baby comes in with generalized convulsions, some of the tests to perform to rule out other causes of seizure, such as meningitis, low sugar in the blood, calcium disorders, and the like, and all these things being normal, it led me to the conclusion along with the bruise that the baby had been injured.

"Q. Now, you mentioned seizures. Did you observe seizures?

"A. No, at the time she wasn't having seizures. She had a tremendous amount of medication in order to control these. She was stopped at the time I saw her.

"Q. And in your opinion, doctor, what would have been the cause of that brain damage that you testified to?

    *     *     *     *     *     *

"A. I felt that this was trauma, nonaccidental trauma, primarily because of the severity of the injury, the fact that there was a bruise on the head with a child. This is very unusual with a two–month old and the types of things that can occur to a baby at this age I felt were not–for instance, falling off the changing table or falling out of the bed or falling off the davenport are just not severe enough to cause this kind of an injury."

When Alysia almost ceased breathing, she was placed in a respirator and taken to the Children's Hospital in Denver. There she was under the care of Dr. Paul Moe, who testified in part:

"Q. Did you examine the baby? ·

"A. Yes, I was requested by the people on her ward to examine her because they were very worried about her convulsions and signs of blood in her eyes.

"Q. Additionally, were there any other physical manifestations aside from blood in the eyes and seizures you observed during the course of treatment of her while she was at the Children's Hospital?

"A. She had a bruised ear and she had some paralysis of the right arm as she got over her convulsions. As has already been stated, she needed help with breathing when she first came in, and that got better over the next couple of days.

    *     *     *     *     *     *

"Q. Now, what was your diagnosis for that baby?

"A. Well, initially we were a little mystified because the baby had severe convulsions, even life–threatening convulsions, swelling of the brain, and then with the discovery of the blood in the eyes, it seemed highly probable all the swelling and convulsions were due to head trauma swelling from a bruise on the brain.

"Q. Do you have an opinion as to the cause of those head injuries?

"A. We . . . the history that was given was incomplete. We really didn't have any information to suggest what the cause of the truama [sic] was. Often in a two–month old with no history of a fall or something is given, it turns out to be

nonaccidental trauma, usually by one of the caretakers.

\*　　\*　　\*　　\*　　\*　　\*

"Q. And in your opinion, could this type of injury been caused by accidental trauma?

\*　　\*　　\*　　\*　　\*　　\*

DR. MOE: The most likely cause, in my experience, is trauma produced by shaking of the baby or accidental dropping of the baby, something like that.

"Q. What percentage, if any, would you give to that, in your experience?

"A. Relatively all, ninety–five or ninety–eight percent of the time. I have seen the same thing with someone being hit by a train or some terrible accident, but otherwise it is always due to trauma in children, in my experience.

\*　　\*　　\*　　\*　　\*　　\*

"Q. Could this type of injury have been caused by a fall?

"A. Well, it would have had to have been a severe fall. In my experience, if a baby falls off a bed, you know, it has happened to all of us when we care for kids, this usually doesn't result in this severe picture, so a trivial fall, in my opinion, wouldn't have caused this."

From the evidence submitted, the jury could have found that the injury to the approximately ten–week–old baby was caused by a severe contact to the head. It could have found that the contact was administered between the hour of 1:00 p. m. on October 31, 1979, when Donna Snyder left her "sleeping," and 2:45 p.m. that day when she returned and the injury had occurred. It could have found that appellant caused the contact inasmuch as he was alone with Alysia during those hours. It could have found the injury was from nonaccidental trauma. We agree with the words of the district court in ruling on appellant's motion for a judgment of acquittal at the close of the State's evidence:

> "Well, without elaborating, the Court feels that there is sufficient evidence to go to the jury at this time. I think the Court must accept, at this point of the

trial for purposes of the motion, that the testimony and the evidence of the State must be construed in the most favorable light. The Court is not in a position to judge the credibility of those witnesses at this time. The testimony now is to the effect Mr. Grabill did have sole and exclusive custody and control of the child for a period. The mother did not notice the bruise until it was called to her attention after this period of custody. She fed, changed, undoubtedly held the baby, was close to it, and reasonable inference is she observed it before and didn't see the bruise. The symptoms of head injury occurred after the period of exclusive custody and control of the defendant. The Court feels that that–and I'm sure I haven't mentioned everything, but I have said enough that the Court could not direct a verdict of acquittal at this time."

■ There being substantial evidence presented in the State's case in chief to sustain the charge, a motion for a judgment of acquittal made at the close of the State's case in chief was properly denied. *Fresquez v. State*, Wyo., 492 P.2d 197 (1971); *Cloman v. State*, supra, 574 P.2d 410; *Russell v. State*, Wyo., 583 P.2d 690 (1978).

■ The same evidence which was sufficient to prevent a judgment of acquittal at the close of the State's case in chief was sufficient (1) to prevent such judgment at the close of all evidence, and (2) to sustain a jury verdict of guilty.

In his defense, appellant denied causing any injury to Alysia. This type of case is by necessity usually presented by the State on circumstantial evidence. The jury chose to accept the circumstantial evidence against appellant rather than his denial. The evidence was such as to form the basis for the jury to draw a reasonable inference of guilt beyond a reasonable doubt.

## ADMISSIBILITY OF EVIDENCE OF PRIOR "BAD ACTS"

Four of appellant's contentions of error are dependent upon the admissibility of evidence relating to instances of appellant's

abusive treatment to other of his children on prior occasions. His second contention of error is that "extrinsic evidence of prior bad acts" was improperly admitted "to impeach" appellant, and his fifth contention of error is that such was improperly admitted "to show intent." His third contention of error is that a photograph depicting the injuries allegedly inflicted on one of the children was improperly admitted into evidence. His fourth contention of error is that error resulted from failure to give a limiting instruction concerning the "bad acts."

The questioned evidence consists of the following testimony by appellant's wife, Sophie Grabill[2] and by his former wife, Freida Sue Bohannon. Sophie Grabill testified that on five or six occasions appellant placed his hand over the mouth and nose of their child, then about six or seven months old, "until he couldn't breathe and his eyes would roll back and he would pass out" for the explained purpose of developing his lungs; and that four or five times he "put his hand under his neck and picked him up and then just put him back down on the couch and he would end up with bruises under his neck." She testified that such occurred when they lived on Craig Street in Detroit, Michigan. She further testified that about two years later while at a friend's house in Waco, Texas, "Christopher poured talcum powder on the pool table, and Gilbert picked him up by the throat and open-handedly on his rear-end he smacked him a few times very hard."

Freida Sue Bohannon testified that when Kimberly, one of three children parented by appellant and Mrs. Bohannon, was four years old, appellant wanted to change a bandage on Kimberly's forehead. When Kimberly objected,

> " * * * he grabbed her by the arm and said, 'It is going to be changed,' and he threw her over his—I was getting her ready for a bath and she didn't have any clothes on, and he threw her over his lap

and started to hit her, and I went after him to stop it. I said, 'Stop it, don't hit her,' and he pushed me out of the bathroom and he locked the door and he proceeded to whip Kimberly for three or four minutes. She was hollering, 'Mommy, help me, help me,' and when he finally opened the door, she had marks all over her buttocks and on the side of her face where he had hit her. The bruises lasted for quite some time, and you could hear, you could hear the 'Please' through the bathroom door."

On recross examination, Mrs. Bohannon was asked by appellant whether or not Kimberly was hospitalized as a result of the incident. She was not, and the State then presented a photograph taken of her the day after the incident to portray the bruises. It was admitted over objection.

Before opening statements, appellant moved the court to exclude evidence relative to these prior "bad acts." He argued that it should be admitted only on rebuttal, and then only after "defendant puts his character into issue or raises this issue of intent." The court sustained the motion in limine and excluded the evidence and all reference to it during the State's case in chief, but it said it would "allow it to come in on rebuttal."

Such evidence was not presented or referred to in the State's case in chief. Appellant testified in his own defense. On direct examination, he testified to his actions on the date of Alysia's injuries; that she was sleeping when he came home at 1:00 p. m.; that Donna Snyder left at 1:00 p. m.; that he tried to awaken Alysia at 1:00 p. m. and "she just wouldn't wake up"; that between 1:00 p. m. and 3:00 p. m. he tried to awaken her again and "I picked her up off the couch and noticed the bruise on her ear," and that when Donna Snyder returned at 3:00 p. m., he "asked Donna if she knew anything about the bruise, how it came about or anything." On cross-examination, over objection, he was asked if it

2. Appellant was not divorced from Sophie, although he was living with Donna Snyder and parented Alysia with her.

were true: (1) that he "would pick Christopher up, put your hand over his mouth until the baby passed out and the eyes rolled in the back of his head," (2) that he said it was done "to help the child to breathe, it would help his breathing," (3) if he recalled "holding your hand under Christopher's neck and lifting him up in the air and holding him there" and if he recalled the resulting black and blue marks, (4) if he recalled "disciplining Kimberly because she had a bandage on" and taking her into the bathroom, "locking the bathroom door and beating her about the back buttocks and all over her body," and if such happened. Appellant answered "no" to each inquiry. On redirect examination he testified that he had "spanked Christopher Grabill one time."

The previously summarized testimony of Sophie Grabill and Freida Sue Bohannon was then presented by the State in rebuttal.

The pertinent part of Rule 404, W.R.E. reads:

"(a) *Character evidence generally.*—Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

"(1) Character of Accused.—Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;

\*      \*      \*      \*      \*      \*

"(b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Another rule pertinent to this issue is Rule 403, W.R.E.:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

In *Kwallek v. State*, Wyo., 596 P.2d 1372 (1979), we distinguish between evidence relative to the character or character trait of the accused to be admitted under Rule 404(a), and evidence relative to motive, opportunity, etc., to be admitted under Rule 404(b). We there noted that the prosecution could not introduce evidence of character or trait under Rule 404(a) until after the accused had *first* introduced similar evidence. But the same restriction does not exist as to evidence introduced to prove motive, opportunity, etc., under Rule 404(b).

The principal test as to the admissibility of the proffered evidence under Rule 404(b) is whether or not it tends directly to prove or disprove a consequential fact such as intent or knowledge, or whether or not it may tend to establish a proposition such as motive, which through a series of inferences may tend to establish the probability of a consequential fact such as intent or knowledge. Evidence which may not pass this test when coupled with the test set forth in Rule 403, if offered in the case in chief or on direct examination, may pass both tests when offered on cross-examination or in rebuttal.

The foregoing is fully said in 2 Weinstein's Evidence, § 404[08], pp. 404–47, 404–49:

"Rule 404(b) does not authorize automatic admission. The rule lists some of the instances in which other crimes evidence may be admissible, but these categories are neither exhaustive nor conclusive. The terminology 'crimes, wrongs, or acts' indicates that conduct that is neither criminal nor unlawful is included if it sheds light on the defendant's character and is relevant to something other than propensity. The proffered item may tend directly to prove or disprove a consequential fact, such as intent or knowledge, or it may tend to establish a proposition, such as motive, which through a series of inferences may tend to establish the probability of a consequential fact such as intent.

"Rule 404(b) is a specialized rule of relevancy. Accordingly, as with any determination pursuant to Rule 401, counsel must be prepared to 1) identify the consequential fact to which the proffered evidence of other crimes, wrongs or acts is directed, 2) prove the other crimes, wrongs or acts, and 3) articulate precisely the evidential hypothesis by which the consequential fact may be inferred from the proffered evidence. Evidence which passes muster up to this point must, in addition, satisfy the balancing test imposed by Rule 403 which requires the probative value of the other crimes evidence to outweigh the harmful consequences that might flow from its admission. * * * " (Footnotes and other section references omitted.)

And in § 404[09], pp. 404–49, 404–50:

" * * * Evidence directed to a category other than propensity is not, however admissible unless this issue is actually being controverted. This is simply a specialized application of the usual rule that evidence must be probative of a fact that is of consequence, that is to say material, to an action in order to be relevant. Although this is an elementary principle of the law of evidence, it has proven difficult to apply in a number of contexts involving other crimes evidence." (Footnotes and other section references omitted.)

During the argument on appellant's motion in limine, the State set forth in detail the consequential facts to which the proffered evidence was to be directed, and he explained more than once the hypothesis by which the consequential facts could be inferred from the proffered evidence. He also detailed the method by which the "bad acts" would be proven.

█ Evidence is always relevant if it tends to prove or disprove one of the elements of the crime charged.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, W.R.E.

And, except as otherwise provided by statute or rule of this court, relevant evidence is admissible. Rule 402, W.R.E. Evidence of a pertinent character trait which is not admissible pursuant to Rule 404(a) to prove action in conformity therewith on a particular occasion, may well be admissible for the other purposes set forth in subsection (b) of such rule. Once admitted for one of these other purposes, such evidence may also have the practical effect of proving that the accused acted in conformity therewith on the pertinent occasion.

Among the elements of the crime of child abuse as contained in the trial court's instructions to the jury, and which it instructed must be established beyond a reasonable doubt in order to find appellant guilty were:

"4. The defendant intentionally or in a reckless disregard of the consequences;

"5. Caused violent physical injury * * *."

On direct examination, appellant was not directly asked whether or not he caused the injury. However, the denial that he did so was indirectly made when he testified that Alysia was sleeping when he came home and that he first noticed the bruise when he picked her up from the couch at a later time. The inference was there presented that the bruise occurred before he came home. His testimony that he asked Donna Snyder when she returned home at 3:00 p. m. "if she knew anything about the bruise, how it came about or anything" further advanced the inference that the bruise occurred before he came home, and the inference was presented that Donna Snyder was responsible for it.

In addressing the element as to whether or not appellant "caused" the injury, the jury was faced with a determination as to the time frame in which the incident occurred. The approximately ten–week–old baby did not fall or otherwise cause the hurt to herself. Only appellant and Donna Snyder could have inflicted the injury. Nor could the baby testify. The jury had a

choice of believing Donna Snyder's testimony that Alysia was well when she left at 1:00 p. m. and was hurt when she returned at 3:00 p. m., or of believing appellant's testimony which inferred that he did not cause the injury during that time frame and that the injury was previously caused by Donna Snyder. And the jury had to address the other element: Was the injury caused "intentionally or in reckless disregard of the consequences?" The prior "bad acts" of appellant were pertinent to establish by inference both of these controverted consequential facts—who caused the injury and the existence of intent or reckless disregard.

Intent is sometimes loosely defined as "merely the absence of accident." *Goodman v. State*, Wyo., 601 P.2d 178, 181 (1979). In *Elliott v. State*, Wyo., 600 P.2d 1044 (1979) the admissibility of testimony of third persons as to prior or subsequent crimes, wrongs or acts in cases involving sexual offenses was analyzed and approved. We will not here again trace the course extensively set forth by Justice Thomas in Elliott. We do note that one of the principal reasons for allowing evidence of prior acts or crimes in cases involving sex offenses is the fact that the usual situation places the testimony of a victim against that of the accused, increasing the pertinency of intent, knowledge, plan, motive, etc. In the words of one case cited by Justice Thomas:

"The testimony was also admissible * * * as evidence tending to buttress the credibility of M and S, minor witnesses who had been charged by the accused with fabricating the evidence against him. Where proof necessarily depends on the credibility of testimony of child witnesses about sexual acts performed in private, and where the accusations of misconduct are flatly denied by the accused, evidence of similar acts may be received on the issue of the credibility of the minor witnesses." *People v. Fritts*, 72 Cal.App.3d 319, 325, 140 Cal.Rptr. 94, 97 (1977).

We do not have here the accused's denial against the testimony of a minor witness— the minor witness is too young to talk, but we do have a need for a practical means of evidencing the identity of the person causing the injury by establishing the time frame, and the intent or the reckless disregard of the consequences, or the lack thereof, on the part of such person.

"Child abuse" and "sexual offenses" are similar with respect to the type of evidence usually available to establish guilt. In fact the act of sexually molesting a child is included in § 6–4–504, W.S.1977 [3] with "intentionally or in a reckless disregard of the consequences" causing injury, and with "assault and battery" as the methods by which the offense of child abuse is accomplished.

The foregoing reflects the result of balancing the probative value of the evidence against the danger of unfair prejudice as required by Rule 403. Again, quoting from Justice Thomas's opinion in *Elliott v. State*, supra, at page 1049:

"The function of performing the comparisons required by Rule 403, W.R.E., generally is held to be discretionary with the trial court. The fact that the evidence is detrimental to the defendant is neutral. For the prejudice factor to come into play the court must conclude that it is unfair. *United States v. Dolliole*, 597 F.2d 102 (7th Cir. 1979). Evaluating this evidence in the light of the decisions of other courts, we cannot hold that the district court in this instance committed an abuse of discretion within the context of Rule 403, W.R.E. *United States v. McPartlin*, 595 F.2d 1321 (6th Cir. 1979). Applying the separate tests required by Rules 404(b) and 403, W.R.E., we conclude that the evidence properly was admitted. See *State v. Tarrell*, supra [74 Wis.2d 647, 247 N.W.2d 696].

" * * * While such evidence properly could have been brought as part of the State's case in chief, the motive of the defendant only assumed more than ordinary significance when the defendant denied the occurrence of the charged of-

**3.** See footnote 1.

fense and ascribed a motive to the victim for testifying untruthfully. Under these circumstances it was perhaps appropriate for the prosecutor to await an additional necessity for such testimony. Permitting the testimony of the older sister to be presented at a time which in most trials would involve rebuttal evidence was proper." (*Bracketed material supplied.)*

■ The same can be said in this instance. The trial court heard arguments on the issue and ruled that the evidence of prior "bad acts" could be admitted only on rebuttal. This exercise of its discretion cannot be said to be an abuse thereof. *Sanville v. State*, Wyo., 593 P.2d 1340 (1979); *Peterson v. State*, Wyo., 586 P.2d 144 (1978).

Since the questioned evidence was properly admitted under Rule 404(b), we need not consider the propriety of admitting it to impeach the credibility of appellant under Rule 608(b), W.R.E.[4]

" * * * Evidence which is admitted generally may be considered for any legal purpose for which it is admissible, although the evidence, when introduced, was intended for a particular purpose. * * * " *Westland Nursing Home, Inc. v. Benson*, 33 Colo.App. 245, 517 P.2d 862, 866 (1974). See *Wilkinson v. Mullen*, 27 Ill.App.3d 804, 327 N.E.2d 433 (1975); *Freeman v. Kansas City Power & Light Co.*, Mo., 502 S.W.2d 277 (1973); *Dudanas v. Plate*, 44 Ill.App.3d 901, 3 Ill.Dec. 486, 358 N.E.2d 1171 (1976).

The photograph was admitted into evidence only after appellant had questioned the severity of appellant's actions against Kimberly. It was cumulative to the testimony of Freida Sue Bohannon.

"The question of admissibility of photographs is left generally to the reasonable discretion of the trial court. *Dickey v. State*, Wyo., 444 P.2d 373, 377 (1968). Photographs are admissible if they correctly portray the subject matter, do not convey false impressions, and if their probative value is such as to outweigh the possibility of undue prejudice from such circumstances as–for example–their gruesome character. *Reeder v. State*, Wyo., 515 P.2d 969, 973 (1973). * * * " *Seyle v. State*, Wyo., 584 P.2d 1081, 1084 (1978).

■ As previously indicated the balancing of the probative value of evidence against its unfair prejudice as required by Rule 403, is first within the discretion of the trial court. An examination of the photograph reflects that it is not gruesome or sensational, and we cannot say that its admission into evidence was an abuse of discretion.

Appellant's fourth contention of error is that error resulted from the court's refusal to give the following instruction, which was requested after the close of the evidence:

"Certain evidence was admitted for a limited purpose. The evidence of the prior bad acts of the accused [sic] was admitted only to show the intent of the accussed [sic]. It is not to be used by you to establish whether or not the act was committed except as to the degree of intent, if any.

"At the time this evidence was admitted you were admonished that it could not be considered by you for any purpose other than the limited purpose for which it was admitted.

"You are again instructed that you must not consider such evidence for any purpose except the limited purpose for which it was admitted."

4. Rule 608(b), W.R.E. provides:

"(b) *Specific instances of conduct.*–Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross–examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross–examined has testified.

"The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of his privilege against self–incrimination when examined with respect to matters which relate only to credibility."

■ Although there may be a question as to whether or not evidence *is* admitted only for a limited purpose if it is probative or one of the elements of the charge, evidence in a criminal proceeding of other crimes, wrongs or acts by the accused has such a potential to result in a verdict based on a determination of guilt for such other crimes, wrongs or acts, rather than for the charged crime, that an instruction should be given, if timely requested, limiting the evidence to the purpose for which admitted or explaining its pertinency to the element of the charge to which it is probative.

In arguing the motion in limine, appellant and the State treated the evidence of prior "bad acts" as having a purpose to show intent or motive. The thrust of appellant's argument was that such evidence was not admissible in the State's case in chief. However, appellant objected when inquiry concerning them was made in cross–examination of appellant as he testified in his behalf. He again objected when the evidence was offered through third–party testimony in the State's case in rebuttal.

During the direct examination of Sophie Grabill, appellant requested the court to "admonish the jury that they can only consider this evidence for the issue of motive and intent. Since it was introduced only for purposes of impeaching the credibility of statements made by Mr. Grabill, then it can only be considered as to the credibility of Mr. Grabill and for no other purpose." The court did not do so.[5]

Appellant's contention in this respect is predicated on Rule 105, W.R.E., which provides:

"When evidence which is admissible as to one (1) party or for one (1) purpose but not admissible as to another party or for

another purpose is admitted, the court, *upon request, shall* restrict the evidence to its proper scope and instruct the jury accordingly." (Emphasis supplied.)

And see *Channel v. State*, Wyo., 592 P.2d 1145 (1979); *Goodman v. State*, supra, 601 P.2d 178. In *Connolly v. State*, Wyo., 610 P.2d 1008 (1980), we held that the failure to give the limiting instruction was error but was not plain error.

We have already recited the sequence of the trial under which the evidence was admitted, i. e., in rebuttal after appellant had testified. We have also noted the consequential facts subject to proof by the evidence, i. e., the time frame during which the injury occurred and whether the injury resulted from intentional or reckless disregard of the consequences. The results of such determination are the identity of the perpetrator and his or her intention. The evidence was essential to prove those elements of the offense.

The question, then, is whether or not the evidence was admitted for a limited purpose. In affirming a conviction of first degree murder for the killing of an infant, the Fourth Circuit Court of Appeals in *United States v. Woods*, 484 F.2d 127 (1973), approved the admission into evidence of a number of instances in which children who were in the care of the defendant suffered difficulties with breathing. The court noted that the listing in Rule 404(b) of the purposes for which evidence of defendant's character or character traits are admissible is not complete and that the range of relevancy outside the ban is almost infinite. It held that the prior incidents were admissible to prove the corpus delicti of murder and other acts of child abuse. Then, with reference to the necessity for a limiting instruction, the court said at page 137:

---

5. Both of the requested instructions were inaccurate. The evidence was admitted not only to show intent or motive and not only to impeach the credibility of appellant, but also to show a reckless disregard of the consequences of the action and, thus, eliminate accident as the cause of the injury. The evidence was presented to lend credence to the testimony of Donna Snyder as to the time frame during which the incident occurred, and, thus, to have probative value as to whether the injury was inflicted by appellant or by Donna Snyder. There was no admonishment at the time the evidence was received as set forth in the instruction tendered after close of evidence. The proposed instruction was incomplete and improper in these respects.

" * * * Unlike other cases where evidence of prior crimes is admissible for only limited purposes and where it is necessary or proper to give limiting instructions, evidence of the prior events was admissible here to prove both that Paul was the victim of infanticide and that defendant was the perpetrator of the crime. In this case, therefore, the district court was correct in not limiting the jury's consideration of the proof of prior events as requested by defendant."

Appellant's prior acts were not admitted only for a limited purpose. They were admitted to prove vital elements of the offense–absence of accident and identity of the perpetrator, and they were admitted in a particular type of case in which the testimony is regularly that of a victim against that of the accused–sex offenses and child abuse. See *Elliott v. State*, supra, 600 P.2d 1044. The evidence has a direct bearing on the relationship to the commission of the offense. *State v. Martin*, 208 Kan. 950, 495 P.2d 89 (1972); *State v. Ralls*, 213 Kan. 249, 515 P.2d 1205 (1973).

As an additional observation, we note that it could have been disadvantageous to the appellant if the court had instructed the jury that the evidence of prior bad acts was admissible only for the purpose of showing that he had a reckless disregard for the consequences of his actions and for the purpose of eliminating accident as the cause of the injury; or to instruct that its purpose was to identify the perpetrator of the crime as between appellant and Donna Snyder. Such instruction could present an undue emphasis on the acts and on appellant's situation. Appellant may have been willing to risk this disadvantage, but his requested instruction was worded otherwise and was, thus, inaccurate.

█ The request for a limiting instruction must be made before error can be predicated on failure to give it.[6] *United States v. Vitale*, 5 Cir. 1979, 596 F.2d 688; *United States v. Bridwell*, 10 Cir. 1978, 583

F.2d 1135; *United States v. Conley*, 8 Cir. 1975, 523 F.2d 650, certiorari denied 424 U.S. 920, 96 S.Ct. 1125, 47 L.Ed.2d 327 (1976). And the requested instruction must not state the law incorrectly. *Stewart v. Capital Transit Co.*, D.C.Cir., 108 F.2d 1 (1939), certiorari denied 309 U.S. 657, 60 S.Ct. 515, 84 L.Ed. 1006 (1940), rehearing denied 309 U.S. 696, 60 S.Ct. 607, 84 L.Ed. 1036 (1940). A legally and factually correct instruction must be tendered to the court before error can be predicated upon refusal to give it. *Benson v. State*, Wyo., 571 P.2d 595 (1977); *State v. Catellier*, 63 Wyo. 123, 179 P.2d 203 (1947); *State v. Parmely*, 65 Wyo. 215, 199 P.2d 112 (1948).

█ We are not here saying that the defendant must word the requested limiting instruction in every case. The request may result in the necessity for the court to word the instruction in a conference between court and counsel for such purpose. But if the request includes the wording itself and the court responds with a differently worded instruction which could bolster the incident in the minds of the jury although being the accurate reason for the receipt of the evidence, the defendant would be foreclosed from assessing and deciding upon the risk. In this case, we only point out that if the evidence were admitted for a limited purpose, the purpose was not that set forth in appellant's request.

## SCOPE OF CROSS–EXAMINATION

Appellant's sixth contention of error is that the court abused its discretion in allowing cross–examination of appellant beyond that upon which inquiry was made in direct examination.

Rule 611(b), W.R.E. sets forth the allowable scope of cross–examination.

"(b) *Scope of cross–examination.*–Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise

---

6. The defendant may not desire such instruction lest the significance of the incidents be bolstered thereby in the minds of the jurors.

of discretion, permit inquiry into additional matters as if on direct examination."

Appellant contends that his testimony on direct examination was restricted to inquiry concerning his activities on the date of Alysia's injuries, and that questions on cross-examination concerning his previous marriages and his treatment of the children of those marriages were beyond the scope of the direct examination and improper.

■ We have already referred to the inference made by appellant in the testimony given on direct examination that the bruise on Alysia occurred before he came home and was caused by Donna Snyder. The court had ruled in connection with appellant's motion in limine that the evidence of "bad acts" would be allowed on rebuttal. We have already noted the relevancy of the evidence to prove the elements of the charge, i. e., "intention or reckless disregard of the consequences," and the time element of the injury. Rule 611(b) gives much discretion to the trial judge in allowing cross-examination. *Nimmo v. State*, Wyo., 603 P.2d 386 (1979). We cannot say that the trial judge abused his discretion in this instance.

"A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances. In determining whether there has been an abuse of discretion, the ultimate issue is whether or not the court could reasonably conclude as it did. An abuse of discretion has been said to mean an error of law committed by the court under the circumstances. * * *" *Martinez v. State*, Wyo., 611 P.2d 831, 838 (1980).

## REMAND FOR CORRECTION OF CLERICAL ERROR

The judgment and sentence in this case was made after appellant was found guilty by a jury. The judgment and sentence of the court recites that appellant had pled guilty to the crime charged in the information. The case is remanded for the purpose of correcting this clerical error in accordance with Rule 37, W.R.Cr.P.

Affirmed and remanded.

ROSE, Justice, dissenting, with whom McCLINTOCK, Justice, joins.

I dissent because I believe that evidence of prior bad acts by the defendant was improperly admitted and highly prejudicial.

## THE EVIDENCE

The defendant was accused of inflicting a blow to the head of Alysia, an infant between nine and ten weeks old, on October 31, 1979. The only evidence linking appellant to the crime is circumstantial. The appellant had sole custody of the child for a certain period and the mother–a Ms. Snyder, also had sole custody of the child for other periods of the day. She testified that she did not abuse the child, even though she did, in the course of her testimony, say that she was sleeping in the same bed as the child that morning and could possibly have struck the child with her elbow while turning or tossing in her sleep. Appellant also denied abusing the child.

Over strenuous objection, the prosecutor was permitted to ask the following "child-beating" and "wife-beating" questions:

"Isn't it true, Mr. Grabill, that on numerous times in October of 1975 . . . that you would pick Christopher [Grabill's five- or six-month-old son] up, put your hand over his mouth until the baby passed out and the eyes rolled in the back of his head?"

". . . Isn't it true that you beat her [the mother of the child alleged to have been abused in this case] in May of 1979 and blackened her eyes?"

"Do you recall . . . getting mad at Christopher [in 1977] because he had spilled talcum powder on the friends' pool table?

\*     \*     \*     \*     \*     \*

"And do you recall picking him up by the neck and holding him in the air and hitting him on the buttocks for doing that?"

"... You don't recall [in 1974] taking Kimberly [Grabill's four-year-old daughter] into the bathroom, locking the bathroom door and beating her about the back buttocks and all over her body? ..."

To impeach the defendant's denial of these allegations, and over insistent defense objection, the State was allowed to produce various witnesses to substantiate and embellish these accusations of prior bad acts. For example, Mrs. Bohannon, Kimberly's mother, the defendant's former wife, testified that after the incident in 1974 she took a picture of the child to her attorney. From the witness stand, she was permitted to testify that, under the law of Michigan, where she and the defendant were living at the time, it was not possible to prosecute someone for a single instance of child abuse. This former wife further testified that she told the defendant she would kill him if he ever laid a hand on one her children again. The picture of Kimberly after the purported 1974 incident was shown to the jury in this case.

In addition to Mrs. Bohannon's testimony, the State also called Christopher's mother, a woman the appellant was still married to but with whom he no longer lived. She elaborated on the incidents with Christopher.

To complete the trilogy of women with whom the defendant had abrasive relations, Alysia's mother, Ms. Snyder, with whom the defendant was living, was allowed to describe a beating which she said she had suffered at the hands of the appellant. To substantiate this witness' claim, the court allowed the State to call a detective who testified that he had investigated a fight between the defendant and Ms. Snyder and that the defendant had confessed to beating up the woman.

The prosecutor was also allowed to introduce testimony having to do with the defendant's explanation of these incidents. The State showed that the appellant had tried to justify the alleged smothering incident as an exercise in aid of the development of the child's lungs. According to the State's testimony, the beating of Kimberly resulted because the child did not want the appellant to change a bandaid on her forehead. The State sought to show that Christopher was struck because he spilled talcum powder on a pool table.

## THE LAW

In *Kwallek v. State*, Wyo., 596 P.2d 1372 (1979), Kwallek had engaged in a fight with a barroom bouncer. He was charged with aggravated assault and battery, and the issue at trial was, essentially, who was at fault. Mr. Kwallek was convicted and appealed on a number of grounds, one of which was his cross-examination concerning prior fights or altercations in which he had been involved. After the question was unsuccessfully objected to, the defendant conceded having participated in other fights. We held that it was error for the prosecutor to question the defendant about past misconduct unrelated in time to the crime for which he was charged. Citing another error in the case as well, we reversed and remanded for a new trial.

In arguing that the prosecutor's question was not error, the State urged that Kwallek had placed his own credibility in question by denying that he was the aggressor. The State also argued that Kwallek's admission of past fights was admissible to show a course of conduct consisting of the propensity for public fighting. We discussed thoroughly and dismissed these arguments. We said:

"... The effect of admitting this evidence for the purpose offered (attacking credibility) or any purpose conceived of by *Lindsay* [*State v. Lindsay*, 77 Wyo. 410, 317 P.2d 506 (1957)], supra, would be to invite the very dangers that we have warned about in *Dorador v. State*, Wyo., 520 P.2d 230 (1974), *Gabrielson v. State*, Wyo., 510 P.2d 534 (1973), *Rosencrance v. State*, 33 Wyo. 360, 239 P. 952 (1925), and *Newell v. State*, Wyo., 548 P.2d 8 (1976)—namely, it requires the defendant to meet and explain other acts than those with which he is charged. Furthermore, the admission of this testimony has a tendency to lead the jury to believe that it is

permissible to convict for conduct other than that with which the defendant is charged."

The allegations of child abuse against Kimberly in 1974 and against Christopher in 1975 and 1977 are remote in time from the incidents of October 31, 1979, with respect to which Grabill was being tried concerning his guilt or innocence. The allegation of beating Alysia's mother in 1979 after a marital–type fight was more related in time, but otherwise hopelessly irrelevant.

I cannot shake the apprehension that the tale of justice denied in Michigan–replete with the evidence that the defendant's former wife would have offered a Michigan court–deprived the defendant of a fair trial on the crime charged. Nor can I dispose of the fear that the evidence of the defendant's confession to an assault against Alysia's mother improperly influenced the jury's deliberations of the issue having to do with whether the defendant committed a crime against Alysia. I cannot conclude, as the majority does, that the testimony of two hostile ex–wives and a mistress with respect to other and unrelated matters did not constitute impermissible character evidence.

I would have reversed.